UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **Jerald Alan Hammann** | **Civil No. 03-3342 (DWF/SRN)** |
| Plaintiff, | |
| v. | **REPORT & RECOMMENDATION** |
| 800 Ideas.com, Inc., a Nevada corporation; 1-800 San Diego, Inc., a California corporation; Steven Parker; Richard Jones; and David Sprouse | |
| **Defendants** | |

Jerald A. Hammann, Pro Se

Christopher K. Sandberg, Esq., on behalf of Defendants

SUSAN RICHARD NELSON, United States Magistrate Judge

The above entitled matter came before the undersigned United States Magistrate Judge on Defendants' Motion for Summary Judgment (Doc. No. 72) and Plaintiff's Motion for Sanctions (Doc. No. 81). This case has been referred to the undersigned for resolution of pretrial matters pursuant to 42 U.S.C. § 636 and Local Rule 72.1.

## I.      BACKGROUND

### A.      Factual Background

This litigation concerns a dispute over the availability of two toll-free numbers: 1-800-246-4238 and 1-888-246-4238. Defendant 800 Ideas functions as a "Responsible Organization"

("RespOrg") authorized by the Federal Communications Commission ("FCC") to dispense toll-free numbers to subscribers, and is a toll-free number subscriber itself.

Defendants contend that as early as February 5, 1993 and before the incorporation of 1-800 Ideas.com, Inc., its predecessors in interest exerted legitimate use and control over the toll-free number 1-800-246-4238. (Aff. of S. Parker, ¶ 33, filed as an exhibit to Defs.' Mem. Supp. Mot. Summ. J.) Defendants contend that in 1997, Defendant 800 Ideas.com entered into a marketing plan with Choice Mortgage USA, wherein 800 Ideas.com assigned the 1-800-246-4238 number to Choice Mortgage USA. Defendants aver that from November 1997 until approximately March 2001, Choice Mortgage USA marketed and paid for the use of the toll-free number 1-800-246-4238. (Parker Aff. at ¶¶ 45-54.)

As to the other disputed "888" number, Defendants state that when 888 numbers were made available by the FCC, subscribers holding 800 numbers were offered the companion 888 numbers. (Parker Aff. at ¶47.) On or about April 2, 1999, Defendant 800 Ideas.com subscribed to the disputed 888 number, but Choice Mortgage USA did not assume use of it. (Id.) At that time, Defendants indicate that Communication Management Services ("CMS") continued to be the RespOrg for the two disputed numbers. (Parker Aff. at ¶ 45.) Defendants further state that in July 2000, after numerous RespOrgs had managed the two disputed numbers, Defendant 800 Ideas.com became a RespOrg and assumed administration of the two numbers. (Parker Aff. at ¶¶ 22, 45.)

In August 2000, Plaintiff attempted to obtain the use of the two numbers noted above from Qwest Communications, to provide toll-free phone service to consumers and service providers for his business, ChoiceTime. Qwest Communications informed Plaintiff that those two numbers were not

2

available as they had been reserved from the toll-free number database. (Fourth Am. Complaint at ¶¶ 69-71.) At the time, Qwest could not tell Plaintiff who was the subscriber for the disputed 800 number, but the subscriber for the disputed 888 number was 800 Ideas.com. (Fourth Am. Complaint at ¶¶ 71-72.)

Plaintiff then searched for the subscriber of the 800 number, contacting Pacific Bell, AT&T and Sprint. Representatives from these three entities indicated that the number was reserved from the toll-free number database and was unavailable for use. (Fourth Am. Complaint at ¶¶ 74-75.)

Next, Plaintiff contacted Sykes Enterprises, Inc., the administrator of the 800 Service Management System ("SMS/800") Database. The SMS Database revealed that the Resp Org for the disputed 800 number was Communications Management Services, a California corporation. (Fourth Am. Complaint at ¶ 77.) Plaintiff contacted Communication Management Services on August 9, 2000, which then maintained office space in the same building as 800 Ideas.com. Plaintiff's call was forwarded to the extension of Richard Jones, an officer of both 800 Ideas.com and 1-800 San Diego. Responding to Plaintiff's message, Mr. Jones requested that Plaintiff send a fax expressing an interest in the disputed 800 number. (Ex. 4 to Plaintiff's Mem. in Opp. to Defs.' Mot. Summ. J.) After Plaintiff sent the fax, Mr. Jones called Plaintiff to discuss the disputed 800 number. (Id.; Fourth Am. Complaint at ¶ 78.)

During the call, Plaintiff alleges that Mr. Jones offered to sell an unidentified Internet domain name to Plaintiff for $100,000 with the disputed 800 number included as part of the package. Mr. Jones also offered to sell an unidentified Internet domain name to Plaintiff for $80,000 with the disputed 888 number included as part of the package. (Fourth Am. Complaint at ¶ 79.) In an affidavit

submitted by 800 Ideas.com in connection with a state court lawsuit brought by Plaintiff, Mr. Jones attests that he never "offered" to sell a number. (Ex. 8 to Pl.'s Mem. in Opp. to Defs.' Mot. Summ. J., 5/31/02 Aff. of R. Jones.)

Plaintiff filed an informal complaint against Communications Management Services with the FCC on August 10, 2000 (Ex. 5 to Pl.'s Mem. in Opp. to Defs.' Mot. Summ. J.), and also filed a lawsuit against Communication Management Services in Hennepin County District Court[1]. (Fourth Am. Complaint at ¶¶ 81, 83.) During the initial exchange of information in the litigation, Plaintiff learned that 800 Ideas.com was the Resp Org for the two toll-free numbers. (Id. at ¶ 85.) In March 2002, 800 Ideas.com routed the disputed numbers to Defendant 1-800 San Diego, Inc., which Plaintiff alleges is an affiliate of 800 Ideas.com. (Id. at ¶ 88.) Defendants' version of events differs slightly, in that they contend that on or about March 15, 2001 and until March 2002, 800 Ideas.com subscribed to and paid for the use of the two disputed numbers as part of their general business. (Parker Aff. at ¶ 48.) In April 2002, Defendants contend that 1-800 San Diego began utilizing the two disputed numbers. (Parker Aff. at ¶¶ 50-57.)

Plaintiff alleges that he believed that 800 Ideas.com would reroute the disputed numbers back to itself, and he later discovered when dialing the numbers, that 800 Ideas.com had rerouted the numbers back to its standard solicitation message. (Id. at ¶ 94.)

In his Complaint, Plaintiff alleges that his intent in seeking the disputed numbers was to use them for his business, Choice Time. (Id. at ¶ 101.) Through his corporation, GoalAssist Corporation,

---

[1] Plaintiff's state court case was ultimately dismissed for lack of personal jurisdiction. (Fourth Am. Complaint at ¶ 92.)

4

Plaintiff contends that he obtained the domain names ChoiceTime.com and ChoiceTime.net, for which he pursued trademark protection. (Id. at ¶ 102-03.) Plaintiff also alleges that he hired software development and creative resources to develop a marketing website, a production website and a spokescharacter. (Id. at ¶ 105.) Plaintiff further alleges that he has attended numerous investment capital conferences to share ChoiceTime's business intentions with potential future investors, though he has never solicited investors for venture capital financing. (Id. at ¶ 106.) Plaintiff contends that because he has been deprived of the use of the disputed numbers, the value of his efforts and expenses with ChoiceTime have been impaired. (Id. at ¶ 108.)

Plaintiff alleges that Defendants have committed various violations with respect to the toll-free numbers such as warehousing, hoarding, brokering, as well as regulatory violations, all to Plaintiff's detriment.

Defendants deny Plaintiff's allegations, arguing that the two disputed numbers have always been in legitimate use; they have always attempted to provide timely and accurate entries to the 800/SMS database; and that because the applicable Resp Org tariff requires that an individual toll-free number be assigned to only one subscriber, given the shared usage of numbers by 800 Ideas' subscribers, 800 Ideas itself remains the customer of record for such numbers. (Defs.' Mem. Supp. Mot. Summ. J. at 8-9, citing Parker Aff. at ¶¶ 39-41, 42; Aff. of C. Sandberg at Exs. 4-9, 21.) Therefore, in this motion, Defendants maintain that no material factual issues remain in dispute concerning the following counts in the Fourth Amended Complaint: (1) warehousing; (2) hoarding; (3) brokering; (5) lag time regulations; and (6) breach of first-come, first serve regulations. (Def.'s Mem. Supp. Mot. Summ. J. at 1.)

### III. DISCUSSION

#### A. Defendants' Motion for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). As to materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden to produce such evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). All evidence will be viewed in the light most favorable to the nonmoving party. E.g., Vette Co. v. Aetna Casualty & Surety Co., 612 F.2d 1076, 1077 (8th Cir. 1980). Pro se pleadings are more liberally construed than those drafted by an attorney. See Smith v. St. Bernards Regional Med. Ctr., 19 F.3d 1254, 1255 (8th Cir. 1994).

**1.     Standing**

As a threshold matter, Defendants challenge Plaintiff's standing.[2] Constitutional standing concerns whether the plaintiff's personal stake in a lawsuit is sufficient to create a concrete "case or controversy" to which the federal judicial power extends under Article III, § 2, of the Constitution. Thinket Ink Information Resources, Inc. v. Sun Microsystems, Inc., 368 F.3d 1053, 1057 (9th Cir. 2004). At a minimum, standing requires that the plaintiff allege (1) injury in fact; (2) causation; and (3) redressability. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). Injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Id.. (citations omitted). For causation, the injury must be "fairly . . . trace[able] to the to challenged action of the defendant, and not . . .th[e] result [of] the independent action of some third party not before the court." Id. (citations omitted). As the non-moving party in a summary judgment motion, a plaintiff must present some evidence to establish a genuine question of fact on the standing issues of injury and causation. See Eddings v. City of Hot Springs, 323 F.3d 596, 602-03 (8th Cir. 2003); Fed. R. Civ. P. 56(e).

Defendants argue that Plaintiff lacks standing in all respects, but particularly as to the injury-in-fact requirement. Defendants' focus on the injury-in-fact requirement is appropriate and it does appear that the amount of Plaintiff's estimated damages, $1.8 billion, is highly speculative. The Court is particularly concerned that as of the date of the motions hearing, Plaintiff was in the process of searching for a damages expert. Still, even if Plaintiff is incorrect about the amount of damages, it is

---

[2]The Court notes that Defendants first raised their standing argument in their reply memorandum, rather than in their initial memorandum. Defendants argue that they did so to rebut Plaintiff's assertion that Defendants did not contest Plaintiff's damages.

indisputable that he did not receive the disputed toll-free numbers. He has sustained some amount of damages as a result. As to causation, Plaintiff contends that "but for" Defendants' actions, Plaintiff would have acquired the disputed numbers, essential to his business for their mnemonic value.

While Plaintiff's allegation that Defendants offered to sell him the disputed numbers as part of an Internet domain name package for $80,000 and $100,000 is denied by Defendants, Defendants nevertheless acknowledge the value of mnemonic toll-free numbers. Steven Parker, Chairman of the Board for both 800 Ideas.com and 1-800 San Diego notes that over the last several years, 800 Ideas.com has worked with over 1000 clients nationwide to develop and implement marketing programs which utilize mnemonic toll-free numbers as a focal point of their marketing programs. (S. Parker Aff. at ¶ 6.) By use of its "specialized computer and telecommunications technology," 800 Ideas.com can share a single 800 number among many businesses located in different parts of the country. (Id. at ¶ 8.) "It is a central focus of 800 Ideas.com's marketing efforts to subscribe to and use a number of mnemonic toll-free numbers so that callers can quickly and easily reach 800 Ideas.com. If 800 Ideas.com was not able to subscribe to and use those toll-free numbers, it would be severely hampered in its ability to marketing [sic] its services." (Id. at ¶ 14) (emphasis added.) Defendant 800 Ideas.com charges its customers for its services in developing their marketing programs. (Id. at ¶¶ 16, 17.)

In light of the foregoing discussion and the record before it, the Court finds that Plaintiff has sufficient standing to bring his claims. Whether he will ultimately prevail on those claims and whether he will be able to buttress his damages claims with expert testimony, is a different matter and is not before the Court today.

### 2. Warehousing, Hoarding and Brokering Claims

The Court addresses Plaintiff's warehousing, hoarding and brokering claims collectively, as they involve similar allegations and Defendants' challenges to those counts are likewise similar. As to the warehousing count, Plaintiff cites 47 CFR 105(b), which prohibits the warehousing of toll-free numbers. Under that provision, there is a rebuttable presumption that the Resp Org is warehousing toll-free numbers if: (1) the Resp Org does not have an identified toll-free subscriber agreeing to be billed for service associated with each toll-free number reserved from the database; or, (2) the Resp Org does not have an identified, billed toll-free subscriber before switching a number from reserved or assigned to working status. ((Fourth Am. Complaint at ¶ 114, citing 47 CFR 52.105(b)(1) & (2)).

Plaintiff alleges that Richard Jones, of 800 Ideas.com, stated in an affidavit submitted in connection with the state court lawsuit that 800 Ideas.com does not obtain toll-free numbers from the national database of numbers without either having an identified subscriber for those numbers or itself paying the underlying carrier for usage on the numbers until a subscriber is prepared to start paying for the numbers. (Id. at ¶ 116.) Plaintiff contends that pursuant to 47 CFR 52.105(b)(2), that when Defendant 800 Ideas.com switches a number from reserved or assigned status to working status while paying the underlying carrier for usage on the numbers until a subscriber is prepared to start paying for the numbers, it is warehousing that number. (Id. at 120.)

As to Plaintiff's hoarding allegations, pursuant to 47 CFR 52.107(a)(1), toll-free subscribers are not permitted to hoard toll-free numbers. Hoarding is the acquisition by a toll-free subscriber from a RespOrg of more toll-free numbers than the toll-free subscriber intends to use for the provision of toll-free service. The definition of hoarding also includes number brokering, which is the selling of a

10

toll-free number by a private entity for a fee. 47 CFR 52.107(a). Routing multiple toll-free numbers to a single toll-free subscriber creates a rebuttable presumption that a toll-free subscriber is hoarding or brokering toll-free numbers. 47 CFR 52.107(a)(3). Plaintiff alleges that as of June 5, 2003, Defendants routed at least twenty toll-free numbers to 800.Ideas.com. (Fourth Am. Complaint at ¶ 134.) Plaintiff avers that Defendants' offer to provide the numbers to Plaintiff for a fee is specifically prohibited.

Defendants, however, contend that at all times, the two disputed numbers were activated for purely legitimate business purposes. In particular, Defendants argue that Plaintiff's allegations regarding "all hoarders" or "all warehousers," do not provide a proper factual basis for his claims. (Defs.' Reply Mem. in Supp. Mot. Summ. J. at 17.)

Defendants are correct that such sweeping statements, standing alone, do not properly support Plaintiff's claims. Here, however, the combination of Plaintiff's factual allegations, pleadings and exhibits creates genuine issues of material fact. In particular, genuine issues of material fact exist as to how Defendants handled the disputed numbers. Accordingly, the Court recommends that summary judgment on these claims be denied.

### 3. Lag Time and First-come, First-served Regulations

Because Plaintiff's claims in Counts 5 and 6 are based on the same regulatory scheme, the Court addresses them collectively, though factual issues as to these counts are similar to the three counts discussed above. Pursuant to 800 Service Management System (SMS/800) Functions, Regulations, Rates and Charges Applying to the Provisions of SMS/800 Functions and Support

Services, Section 2.12(A)(1)&(2)[3], a Resp Org may not assign or transfer the use of services except where there is no interruption of use of the service. In that case, such assignment or transfer may be made to: (1) another Resp Org, whether an individual, partnership, association or corporation, provided the assignee or transferee assumes all outstanding indebtedness for such services, and the unexpired portion of the minimum period applicable to such services, if any; or (2) a court-appointed receiver, trustee or other person acting pursuant to law in bankruptcy, receivership, reorganization, insolvency, liquidation or other similar proceedings, provided the assignee or transferee assumes the unexpired portion of the minimum period applicable to such services, if any. (800 Service Management System (SMS/800) Functions, Regulations, Rates and Charges Applying to the Provisions of SMS/800 Functions and Support Services, Section 2.12(A)(1)&(2)).

Plaintiff's Fourth Amended Complaint avers that according to Richard Jones of Defendant 800 Ideas.com, Choice USA Mortgage utilized the disputed toll-free numbers from November 1997 until or about March 15, 2001. (Fourth Am. Complaint at ¶ 165.) From March 15, 2001 until approximately March 2002, the disputed toll-free numbers were allegedly used by 800 Ideas.com in the course of its normal business practices. (Id. at ¶ 166.) From approximately March 13, 2002, Defendant 1-800 San Diego was formed and began utilizing the two disputed numbers as a key part of its business plan. (Id. at ¶ 167.) Plaintiff therefore alleges that when Defendants disconnected the number from Choice USA Mortgage on or about March 15, 2001, there was an interruption in use of the service. (Id. at ¶ 168.) Furthermore, Plaintiff alleges that on or about March 15, 2001, Defendants disconnected the

---

[3] See http://www.sms800.com, at "Becoming a RespOrg."

disputed numbers from ChoiceUSA Mortgage without simultaneously placing them in disconnect status in the SMS Database. (Id. at ¶ 169.) Plaintiff contends that at the same time, Defendants returned the disputed numbers directly to working status without first allowing them to go into the spare category upon expiration of a four-month disconnect interval. (Id. at ¶ 170, citing 47 CFR 52.103(d)).[4]

As to the first-come, first-served regulations, pursuant to 47 CFR 52.111, toll-free numbers shall be made available on a first-come, first-served basis. (See also, Regulations, Rates and Charges Applying to the Provisions of SMS/800 Functions and Support Services, Section 2.12(B)). Plaintiff alleges that prior to the March 13, 2002 transfer of the disputed numbers to 1-800 San Diego, Defendants were aware that Plaintiff had requested the assignment of the disputed numbers in his August 9, 2000 telephone conversation with 800 Ideas.com. (Fourth Am. Complaint at ¶ 187.) Likewise, Plaintiff maintains that Defendants were aware that Plaintiff had requested from the FCC that he be assigned the disputed numbers prior to the March 13, 2002 transfer of the numbers to 1-800 San Diego. Finally, based on his state court lawsuit, Plaintiff maintains that Defendants were aware of his request to be assigned the disputed numbers. (Id. at ¶¶ 188; 190). Thus, Plaintiff maintains that by transferring the disputed numbers to 1-800 San Diego and/or refusing to transfer the disputed 888 number when Defendants knew that Plaintiff had requested the number(s) first, they violated the first-come, first-served regulations. (Id. at ¶ 195.)

Defendants argue that as to the lag time regulations, the two disputed numbers have at all times

---

[4]Plaintiff alleges similar conduct in ¶¶ 171-178 of his Fourth Amended Complaint, all of which he contends violates Regulations, Rates and Charges Applying to the Provisions of SMS/800 Functions and Support Services, Section 2.12(A)(1)&(2).

been legitimately in use by Defendants and have never lapsed into a reserved or non-used unpaid status. (Parker Aff. at ¶¶ 23, 24, 29-32; Sandberg Aff. at Exs. 4-9.)  In addition, citing Patients Plus, Inc. v. Long Distance Telecommunications Service, Inc., 1997 WL 538950 (F.C.C. Aug. 28, 1997), Defendants contend that Plaintiff has failed to provide any evidence that he formally requested the disputed numbers.  Unlike the subscriber in Play Time, Inc. v. LDDS Metromedia Communications, Inc., 123 F.3d 23, 25-27 (1st Cir. 1997), Defendants argue that Plaintiff did not enter into a formal request for the two numbers, did not enter into a contract granting him the numbers, nor was Plaintiff ever assured by Defendants that the two disputed numbers would be assigned to him.

From the recitation of facts above, the Court concludes that numerous disputes of material fact preclude summary judgment.  Regarding the lag time violations, Plaintiff has raised sufficient fact issues as to how Defendants handled the two disputed numbers.  As to whether or not Plaintiff made a request that the disputed numbers be assigned to him is also a fact issue.

### 4. Additional Relief

In light of the Court's denial of summary judgment, Defendants' request for fees and costs is likewise denied.  Also, Plaintiff's request that consideration of summary judgment be stayed, pending further discovery, is denied.

### B. Plaintiff's Motion for Sanctions

Plaintiff moves for discovery sanctions based on Defendants' actions in responding to this Court's Order of November 24, 2004.  In the Order, the Court directed Defendant to produce responses to Plaintiff's Request for Production of Document Numbers 6, 7 and 8 and Interrogatory Numbers 1, 3, and 4, as the discovery related to toll-free numbers.  Plaintiff's motion for sanctions is

based on both Defendants' production and the manner in which Defendants offered to make documents available for production.

Plaintiff maintains that he contacted Defendants in December 2004 because he was concerned that Defendants might not produce the information or would produce it too late for it to be useful in responding to Defendants' summary judgment motion, filed on December 1, 2004. (Pl.'s Mem. Supp. Mot. Sanctions at 2.) Defendants responded by letter on December 21, 2004, asserting that because several of the requests at issue did not relate to toll-free numbers, they need not provide a response. (Ex. 2, Pl.'s Mem. Supp. Mot. Sanctions.) In addition, rather than answering Interrogatories 3 and 4, Defendants cited Fed. R. Civ. P. 33(d), which permits them to produce documents containing the requested information, rather than answering the interrogatories outright. Furthermore, Defendants object to discovery requests for information involving toll-free numbers other than the two disputed numbers.

As to the method by which Defendants proposed to make such discovery available, Defendants proposed to make their business files available as they are kept in the normal course of business, and to allow Plaintiff to inspect them at Defendants' offices in San Diego, on a selected day during the week of January 3, 2005. (Ex. 2, Pl.'s Mem. Supp. Mot. Sanctions.)

Plaintiff contends that Defendant has at least 39,780 records and for Plaintiff to review even a fraction of them and assemble the information meaningfully into Exhibit 1 to his Memorandum in Opposition, it took thirteen hours; Defendants only offered Plaintiff forty hours to gather the requested information. Defendants apparently do not possess a photocopier, which also added to Plaintiff's difficulty in procuring copies of the relevant documents.

15

Defendants' counsel states that he has not personally been to San Diego to review his clients' records, but instead relies on their representations that, for example, Defendants do not keep electronic records, but merely paper copies of documents that might be responsive to Document Request Number 6, for example.[5]

The Court is concerned about the course of discovery, particularly as the Court has ruled on this subject previously, and will grant Plaintiff's motion for sanctions, in part. Lest there be any further confusion, the Court's Order of November 2004 required Defendants to answer Interrogatories 1, 3 and 4 and to produce documents in response to Document Request Numbers 6, 7 and 8. The Court ruled that such documents were arguably relevant and Defendants may not further limit the scope of those requests because they feel such requests do not "relate to toll-free numbers" or do not relate to the two disputed numbers. While Defendants object to producing any information relating to toll-free numbers other than the two numbers at issue, such information is relevant and should be produced.

To the extent that Defendants continue to require clarification of the wording of these requests, or claim to have no documents relevant, the parties are obliged to meet and confer with each other immediately to determine the categories of documents that sufficiently respond to the outstanding discovery requests. If they are unable to reach an agreement quickly, they are required to contact the Court for an informal telephone conference to resolve any remaining disputes. Defendants are to

---

[5]A representation made all the more surprising given Chairman of the Board Steven Parker's sworn statement that 800 Ideas.com has made a significant financial investment in computer and telecommunications technology – an advantage it has parlayed to 'set itself apart.' (Parker Aff. at ¶¶ 7-8.) The Court is somewhat incredulous, given Defendants' line of business, that they do not maintain electronic records.

provide full responses to the outstanding discovery requests and/or make arrangements for Plaintiff to review the applicable documents within fourteen days of the date of this Order. The Court is appreciative of Defendants' counsel's representations that Defendants will provide a photocopier and allow Plaintiff as much time as necessary to review the documents.

As to Defendants' reliance on Fed. R. Civ. P. 33, it is true that providing documents produced in the ordinary course of business is an acceptable method of responding to interrogatories. Defendants, however, must ascertain whether it is possible to produce much of the requested information in electronic form and, if so, they must produce it in that manner. Defendants' counsel must re-confirm with his clients regarding the presence of electronic data and have his clients submit an affidavit to that effect. The depositions of Defendants may take place in Minneapolis.

As to Plaintiff's request for monetary sanctions due to the expenditure of his time, it is denied.

**THEREFORE, IT IS HEREBY RECOMMENDED that:**

    1.    Defendants' Motion for Summary Judgment (Doc. No. 72) be **DENIED**; and

    2.    Plaintiff's Motion for Sanctions (Doc. No. 81) be **GRANTED.**

Dated: June 17, 2005

                          s/Susan Richard Nelson
                          SUSAN RICHARD NELSON
                            United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by July 5, 2005 after being served with a copy thereof. The objecting party must file with the Clerk of the Court and serve on all parties, written objections which specifically identify the portions of the proposed findings, recommendations, or report to which objection is being made, and a brief in support thereof.

A party may respond to the objecting party's brief within ten days after service thereof.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.