## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Jerald Alan Hammann,                          Civil No. 03-3342 (PJS/RLE)

      Plaintiff,

      v.                                    **REPORT AND**
                                           **RECOMMENDATION**

1-800 Ideas.com, Inc., 1-800 San Diego Inc.,
Steven Parker, Richard Jones,
David Sprouse, and 800-Ideas, Inc.

      Defendants.

_____

Jerald Alan Hammann, pro se

Christopher K Sandberg, Esq. and Darla Jo Boggs, Esq. on behalf of Defendants 1-800
Ideas.com, Inc., 1-800 San Diego Inc., Steven Parker,  Richard Jones, and David
Sprouse

David M. Johnson, Esq. on behalf of Defendant 800-Ideas, Inc.

_____

SUSAN RICHARD NELSON, United States Magistrate Judge

      Pending before the Court is Defendants 1-800 Ideas.com, Inc., 1-800 San Diego

Inc., Steven Parker,  Richard Jones, and David Sprouse's (the Original Defendants')

Motion to Dismiss (Doc. No. 122), Defendant 800-Ideas, Inc.'s Motion to Dismiss for

Lack of Personal Jurisdiction (Doc. No. 153), Plaintiff's Motion for Summary Judgment

on his claims against 800 Ideas, Inc. (Doc. No. 172) (which has not been noticed for a

hearing date), and Plaintiff's Motion for Summary Judgment on his claims against

Original Defendants (Doc. No. 143).  These motions have been referred to the

undersigned pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

## I.    BACKGROUND

This litigation concerns a dispute over the availability of two toll-free numbers: 1-800-246-4238 and 1-888-246-4238 (Disputed Numbers) which have mnemonic significance to Plaintiff (the last seven digits of each spell "Choice T").  Defendant 1-800 Ideas.com, Inc., which the parties also refer to as 800 Ideas.com, Inc., functions as a Responsible Organization (also called a Resp Org) authorized by the Federal Communications Commission (FCC) to dispense toll-free numbers to subscribers and is a toll-free number subscriber itself.  The background of this case has been previously articulated by the Court in its June 17, 2005 Report and Recommendation on Original Defendants' prior motion for summary judgment.  (See Doc. No. 96 at 1-5.)  That background is not materially different from the facts now before the Court and the Court reprints below the background section from its June 17, 2005 Report and Recommendation.  Where appropriate, the Court references separately herein discovery relevant to the present motions which was obtained after the Court's last ruling on Defendants' motion for summary judgment.  The background of the case as set forth by the Court previously is as follows:

> [Original] Defendants contend that as early as February 5, 1993 and before the incorporation of 1-800 Ideas.com, Inc., its predecessors in interest [800-Ideas, Inc.] exerted legitimate use and control over the toll-free number 1-800-246-4238.  (Aff. of S. Parker, ¶ 33, filed as an exhibit to Defs.' Mem. Supp. Mot. Summ. J.) [Original] Defendants contend that in 1997, Defendant [1-800 Ideas.com, Inc.] entered into a marketing plan with Choice Mortgage USA, wherein [1-800 Ideas.com, Inc.] assigned the 1-800-246-4238 number to Choice Mortgage USA. [Original] Defendants aver that from November 1997 until approximately March 2001, Choice Mortgage USA marketed and paid for the use of the toll-free number 1-800-246-4238.  (Parker Aff. at ¶¶ 45-54.)
>
> As to the other disputed "888" number, [Original] Defendants state that

when 888 numbers were made available by the FCC, subscribers holding 800 numbers were offered the companion 888 numbers. (Parker Aff. at ¶47.) On or about April 2, 1999, Defendant [1-800 Ideas.com, Inc.] subscribed to the disputed 888 number, but Choice Mortgage USA did not assume use of it. (Id.) At that time, [Original] Defendants indicate that Communication Management Services ("CMS") continued to be the RespOrg for the two disputed numbers. (Parker Aff. at ¶ 45.) [Original] Defendants further state that in July 2000, after numerous RespOrgs had managed the two disputed numbers, Defendant [1-800 Ideas.com, Inc.] became a RespOrg and assumed administration of the two numbers. (Parker Aff. at ¶¶ 22, 45.)

In August 2000, Plaintiff attempted to obtain the use of the two numbers noted above from Qwest Communications, to provide toll-free phone service to consumers and service providers for his business, ChoiceTime. Qwest Communications informed Plaintiff that those two numbers were not available as they had been reserved from the toll-free number database. (Fourth Am. Complaint at ¶¶ 69-71.) At the time, Qwest could not tell Plaintiff who was the subscriber for the disputed 800 number, but the subscriber for the disputed 888 number was [1-800 Ideas.com, Inc.] (Fourth Am. Complaint at ¶¶ 71-72.)

Plaintiff then searched for the subscriber of the 800 number, contacting Pacific Bell, AT&T and Sprint. Representatives from these three entities indicated that the number was reserved from the toll-free number database and was unavailable for use. (Fourth Am. Complaint at ¶¶ 74-75.)

Next, Plaintiff contacted Sykes Enterprises, Inc., the administrator of the 800 Service Management System ("SMS/800") Database. The SMS Database revealed that the Resp Org for the disputed 800 number was Communications Management Services, a California corporation. (Fourth Am. Complaint at ¶ 77.) Plaintiff contacted Communication Management Services on August 9, 2000, which then maintained office space in the same building as [1-800 Ideas.com, Inc.] Plaintiff's call was forwarded to the extension of Richard Jones, an officer of both [1-800 Ideas.com, Inc.] and 1-800 San Diego. Responding to Plaintiff's message, Mr. Jones requested that Plaintiff send a fax expressing an interest in the disputed 800 number. (Ex. 4 to Plaintiff's Mem. in Opp. to Defs.' Mot. Summ. J.) After Plaintiff sent the fax, Mr. Jones called Plaintiff to discuss the disputed 800 number. (Id.; Fourth Am. Complaint at ¶ 78.)

During the call, Plaintiff alleges that Mr. Jones offered to sell an unidentified Internet domain name to Plaintiff for $100,000 with the disputed 800 number included as part of the package. Mr. Jones also offered to sell an unidentified Internet domain name to Plaintiff for $80,000 with the disputed 888 number included as part of the package. (Fourth Am. Complaint at ¶ 79.) In an affidavit submitted by [1-800 Ideas.com, Inc.] in connection with a state court lawsuit brought by Plaintiff, Mr. Jones attests that he never "offered" to sell a number. (Ex. 8 to Pl.'s Mem. in Opp. to Defs.' Mot. Summ. J., 5/31/02 Aff. of R. Jones.)

3

Plaintiff filed an informal complaint against Communications Management Services with the FCC on August 10, 2000 (Ex. 5 to Pl.'s Mem. in Opp. to Defs.' Mot. Summ. J.), and also filed a lawsuit against Communication Management Services in Hennepin County District Court[1]. (Fourth Am. Complaint at ¶¶ 81, 83.)   During the initial exchange of information in the litigation, Plaintiff learned that [1-800 Ideas.com, Inc.] was the Resp Org for the two toll-free numbers.  (Id. at ¶ 85.)  In March 2002, [1-800 Ideas.com, Inc.] routed the disputed numbers to Defendant 1-800 San Diego, Inc., which Plaintiff alleges is an affiliate of [1-800 Ideas.com, Inc.] (Id. at ¶ 88.)  Original Defendants' version of events differs slightly, in that they contend that on or about March 15, 2001 and until March 2002, [1-800 Ideas.com, Inc.] subscribed to and paid for the use of the two disputed numbers as part of their general business.  (Parker Aff. at ¶ 48.)  In April 2002, [Original] Defendants contend that 1-800 San Diego began utilizing the two disputed numbers. (Parker Aff. at ¶¶ 50-57.)

Plaintiff alleges that he believed that [1-800 Ideas.com, Inc.] would reroute the disputed numbers back to itself, and he later discovered when dialing the numbers, that [1-800 Ideas.com, Inc.] had rerouted the numbers back to its standard solicitation message.  (Id. at ¶ 94.)

In his Complaint, Plaintiff alleges that his intent in seeking the disputed numbers was to use them for his business, Choice Time.  (Id. at ¶ 101.) Through his corporation, GoalAssist Corporation, Plaintiff contends that he obtained the domain names ChoiceTime.com and ChoiceTime.net, for which he pursued trademark protection.  (Id. at ¶ 102-03.)  Plaintiff also alleges that he hired software development and creative resources to develop a marketing website, a production website and a spokescharacter.  (Id. at ¶ 105.)  Plaintiff further alleges that he has attended numerous investment capital conferences to share ChoiceTime's business intentions with potential future investors, though he has never solicited investors for venture capital financing.  (Id. at ¶ 106.)  Plaintiff contends that because he has been deprived of the use of the disputed numbers, the value of his efforts and expenses with ChoiceTime have been impaired.  (Id. at ¶ 108.)

Plaintiff alleges that [Original] Defendants have committed various violations with respect to the toll-free numbers such as warehousing, hoarding, brokering, as well as regulatory violations, all to Plaintiff's detriment.

[Original] Defendants deny Plaintiff's allegations, arguing that the two disputed numbers have always been in legitimate use; they have always attempted to provide timely and accurate entries to the 800/SMS database; and that because the applicable Resp Org tariff requires that an individual toll-free number be assigned to only one subscriber, given the shared usage

---

[1]Plaintiff's state court case was ultimately dismissed for lack of personal jurisdiction.  (Fourth Am. Complaint at ¶ 92.)

of numbers by 800 Ideas' subscribers, 800 Ideas itself remains the customer
of record for such numbers.  (Defs.' Mem. Supp. Mot. Summ. J. at 8-9, citing
Parker Aff. at ¶¶ 39-41, 42; Aff. of C. Sandberg at Exs. 4-9, 21.)

(Id. (citations omitted)).  On October 24, 2005, this Court granted Plaintiff leave to file a

Fifth Amended Complaint which added 800-Ideas, Inc. as a party.  (Doc. No. 118.)  On

November 1, 2005, Plaintiff filed his Fifth Amended Complaint.  (Doc. No. 120.)  On

November 15, 2005, Original Defendants filed an Answer to the Fifth Amended

Complaint.  (Doc. No. 134.)

The matter now comes before the Court on Original Defendants' Motion to

Dismiss (Doc. No. 122), Defendant 800-Ideas, Inc.'s Motion to Dismiss for Lack of

Personal Jurisdiction (Doc. No. 153), Plaintiff's Motion for Summary Judgment on his

claims against 800 Ideas, Inc. (which has not been noticed for a hearing date), and

Plaintiff's Motion for Summary Judgment on his claims against Original Defendants

(Doc. No. 143).

## II.    DISCUSSION

### A.    Original Defendants' Motion to Dismiss (Doc. No. 122)

In their Motion to Dismiss (Doc. No. 122), Original Defendants argue that: (1) all

of the claims must be dismissed because (a) the real Plaintiff in interest in this case is

not Jerald Hammann but Goal Assist Corporation, the corporation over which Hammann

presides as sole shareholder, (b) Hammann has committed fraud on the Court by

representing that he is a pro se litigant when he is not; (2) the claims against the

individual defendants must be dismissed because (a) they have not been personally

served with any of the complaints, (b) the law of the case and 47 U.S.C. §§ 217 and 411

preclude them from liability; and (3) if the case is not dismissed, it should be transferred

to California for the convenience of Defendants and the witnesses and in the interests of

justice.  (See Docs. 124 at 6-17, 174 at 2-19.)  On January 12, 2006, the Court granted

Original Defendants' oral motion, made at the January 6, 2006 motion hearing, to

convert the portion of their Motion to Dismiss (Doc. No. 122) based on Federal Rule of

Civil Procedure 12(b)(6) to a motion for summary judgment.  (See Doc. No. 194.)

### 1.   Dismissal of Suit Based on Real Party in Interest and Fraud on the Court

Original Defendants have again challenged Plaintiff's right to bring this suit

individually and to proceed pro se.  On April 7, 2005, in their Memorandum in

Opposition to Plaintiff's Motion and Memorandum in Support of Discovery Sanctions,

Original Defendants argued:

> It should be noted that the law does not allow a corporation to proceed with a law suit pro se.  Plaintiff's only asserted damages are purported damages to the corporation "GoalAssist."  If the corporation "GoalAssist" is the true party in interest, then either Plaintiff cannot represent "GoalAssist," as a pro se litigant, or the case should be dismissed since the true party in interest is not in the present case.

(Doc. No. 92 at 6 n.13 (citations omitted).  This Court recommended to the trial court,

the Honorable District Court Judge Donovan Frank presiding, that Plaintiff's Motion for

Sanctions be granted in part and that Original Defendants' motion for summary

judgment be denied.  (Doc. No. 96.)  On July 5, 2005, in their Objections to and Appeal

From Magistrate's Report and Recommendation filed with Judge Frank, Original

Defendants' contended:

> In the Eight[h] Circuit, a corporation cannot proceed with a law suit pro se. Plaintiff seeks alleged damages solely on behalf of the corporation "GoalAssist."  According to the Minnesota Secretary of State's Office,

GoalAssist is a domestic corporation in good standing as of 2005. Such a corporation cannot be represented in a legal proceeding by a pro se litigant. Even though this point was raised in Defendants' memorandum opposing Plaintiff's request for discovery sanctions, and again during the oral argument on April 13, 2005, the Magistrate's Report completely failed to address this issue. The present suit should be dismissed because: (1) the Plaintiff in this case is Mr. Jerald Hammann, a private individual, not the corporation GoalAssist; (2) GoalAssist is not a party to the present litigation, but all the alleged damages Mr. Hammann seeks were incurred by GoalAssist; and (3) even if GoalAssist were a party to the action, Mr. Hammann could not represent it pro se.

(Doc. No. 98 at 4-5 (citations omitted)). After considering Original Defendants' objections, Judge Frank adopted this Court's recommendations and granted sanctions against Original Defendants and denied their motion for summary judgment. (Doc. No. 103.)

### a.    Real Party in Interest

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).

In response to a motion for summary judgment, "the non-moving party" must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a

7

genuine issue for trial.'"  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986) (quoting

Fed. R. Civ. P. 56(c) & (e)).  "If the adverse party does not so respond, summary

judgment, if appropriate, shall be entered against the adverse party."  Fed. R. Civ. P.

56(e).  The evidence and all reasonable inferences are viewed in the light most

favorable to the non-moving party.  <u>Dorsey v. Pinnacle Automation Co.</u>, 278 F.3d 830,

834-35 (8th Cir. 2002).  A dispute about material facts is genuine only "if the evidence is

sufficient to allow a reasonable jury to return a verdict for the non-moving party."

<u>Landon v. N.W. Airlines, Inc</u>. 72 F.3d 620, 624 (8th Cir. 1995).  If the non-moving party

"fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial," then

Rule 56(c) requires the entry of summary judgment against such party.  <u>Celotex</u>, 477

U.S. at 322-23.

Original Defendants now argue that the following facts are undisputed:

- GoalAssist Corporation is a Minnesota Corporation in good standing.
- Plaintiff is the president and sole shareholder of GoalAssist.
- GoalAssist Corporation obtained the domain names ChoiceTime.com and Choice.Time.net.
- GoalAssist Corporation sought trademark protection for the name Choice Time in the U.S. and Canada.
- "Choice Time" is a registered trademark name functioning under the umbrella of GoalAssist.
- GoalAssist Corporation hired and funded software development to create a marketing website, presumably for "ChoiceTime."
- GoalAssist Corporation filed for three patent applications.
- Interests concerning the fledgling business venture, "ChoiceTime.com" were formulated under the umbrella of the corporation GoalAssist.
- Expenditures made on behalf of the fledgling business venture "Choice Time" were made by GoalAssist Corporation.
- Mr. Hammann solicits clients and completes consulting projects on behalf of GoalAssist Corporation.

- Revenues earned by Mr. Hammann's consulting efforts are funneled through GoalAssist.
- Mr. Hammann's expenses incurred in the course of completing consulting work are funneled through GoalAssist.
- Expenses associated with Choice Time are funneled through GoalAssist.
- The claims presently before this Court relate to Plaintiff's business concept Choice Time, a yet unfunded and unproven business concept.
- Choice Time controls no assets.  Any assets related to Choice Time "are owned by and/or assigned to GoalAssist Corporation."
- Any damages that might potentially be determined in these proceedings would belong to the GoalAssist Corporation and not Mr. Hammann individually.
- GoalAssist Corporation is presently not a party to these proceedings.
- Plaintiff, appearing <u>pro se</u> is currently the sole plaintiff listed herein.

(Doc. No. 124 at 3-5.)

Plaintiff concedes that he owns both GoalAssist and ChoiceTime and has stated that, during the relevant time period, ChoiceTime was not a corporation but an unregistered trade name used by Plaintiff.  (Sandberg Aff. Ex. A. at 14, 21-22.)  Plaintiff submitted his affidavit in response in which he states, "My intent on August 6, 2000 in seeking to initiate toll-free service with Qwest on my personal phone bill using the disputed numbers was to employ the numbers in business operations for a business I was developing under the intended corporate and brand name of Choice Time." (Hammann Aff. Ex. 5 ¶ 5.)  He continues, "All expenses incurred on behalf of ChoiceTime are paid by me from my personal assets and personal bank account" and are reported "on the tax returns of GoalAssist Corporation, a corporation I established in 1996 for my business consulting practice."  (<u>Id.</u> ¶ 7.)  While Plaintiff concedes that Goal Assist is currently in good standing, in his affidavit he states, "As of August 6, 2000 and continuing up to May 16, 2005, GoalAssist was not in Good Standing with the State of

Minnesota."  (Id. ¶ 12.)  Original Defendants contend that Plaintiff's March 22, 2004

deposition testimony conflicts with Plaintiff's claims about the good standing of

GoalAssist.  (Doc. No. 174 at 12.)  At his deposition, Plaintiff testified, "It's probably

accurate to say that [GoalAssist is] in good standing as of 2001, but there is a small

dispute about that."  (Sandberg Aff. Ex. A at 8.)

Plaintiff argues that most of the "undisputed facts" Original Defendants present

were available to Original Defendants when they moved for summary judgment in

December 2004, and thus are barred by res judicata and collateral estoppel.  (Doc. No.

149 at 11.)  To the extent that GoalAssist is determined to be the real party in interest,

Plaintiff contends that dismissal is not permitted because Federal Rule of Civil

Procedure 17(a) provides: "No action shall be dismissed on the ground that it is not

prosecuted in the name of the real party in interest until a reasonable time has been

allowed after objection for ratification of commencement of the action by, or joinder or

substitution of, the real party in interest; and such ratification, joinder, or substitution

shall have the same effect as if the action had been commenced in the name of the real

party in interest."  (Id.)

The Court finds that the bulk of the material Original Defendants cite in support of

their motion has been available to them for some time and prior to their filing of their

motion for summary judgment in December 2004.  But the Court disagrees with Plaintiff

that res judicata or collateral estoppel apply to bar Original Defendants from raising the

real party in interest issue now.  Instead, Original Defendants arguments are barred by

the law of the case doctrine.  "'The law of the case doctrine prevents the relitigation of a

settled issue in a case and requires courts to adhere to decisions made in earlier

proceedings'" and "'applies to issues decided implicitly as well as those decided explicitly.'"  Mosley v. City of Northwoods, 415 F.3d 908, 911 (8th Cir. 2005) (quoting Kan. Pub. Employees Ret. Sys. v. Blackwell, Sanders, Matheny, Weary & Lombardi, L.C., 114 F.3d 679, 687 (8th Cir. 1997), cert. denied, 522 U.S. 1068 (1998).  In this case, Original Defendant expressly challenged Plaintiff's status as the real party in interest in their Objections to and Appeal From Magistrate's Report and Recommendation filed with Judge Frank on July 5, 2005.  (See Doc. No. 98 at 3-4.) Defendants did not raise the issue in passing but argued that "[t]he present suit should be dismissed because: (1) the Plaintiff in this case is Mr. Jerald Hammann, a private individual, not the corporation GoalAssist; (2) GoalAssist is not a party to the present litigation, but all the alleged damages Mr. Hammann seeks were incurred by GoalAssist; and (3) even if GoalAssist were a party to the action, Mr. Hammann could not represent it pro se."  (Id.)  Judge Frank did not dismiss the suit but instead denied Original Defendants' motion for summary judgment.  (Doc. No. 103.)  By presenting the issue to the trial court as a basis for dismissal, Original Defendants ran the risk that the determination of the trial court would bind them and prevent them from later raising the same issue.  Therefore, the Court finds that the law of the case doctrine bars Original Defendants from raising the issue now.

Even if the law of the case doctrine did not bar their real-party-in-interest attack on Plaintiff's claims, however, the Court finds that there are genuine issues of material fact that preclude issuing summary judgment for Original Defendants.  While there are some inconsistencies in Plaintiff's deposition testimony and his affidavit and exhibits, the Court finds that there is a factual dispute as to whether Plaintiff, or Plaintiff doing

11

business as Choice Time, was the real party in interest during the relevant time period.

While Plaintiff's November 3, 2005 deposition testimony, to which Original Defendants

cite in support of their argument, supports the view that ChoiceTime and GoalAssist are

closely related, it does little to resolve the factual dispute surrounding whether Plaintiff,

Jerald Alan Hammann, is the real party in interest.  Therefore, Original Defendants are

not entitled to summary judgment on the real party in interest issue.

**b.**     **Fraud on the Court**

Original Defendants also charge that Plaintiff's claims should be dismissed

because he has engaged in fraud on the Court by representing that he is proceeding

pro se when, in fact, Plaintiff has testified under oath that he has worked with a patent

attorney and another attorney in connection with this litigation.  (Doc. No. 174 at 2-8.)  In

support of this bold contention, Original Defendants cite the following evidence: (1)

Plaintiff's testimony that he had contacted his patent attorney and another attorney in

connection with this litigation; (2) Plaintiff's testimony that he incurred legal fees in this

litigation for himself and in connection with his expert witness "in the neighborhood of 2

to 5,000" dollars from March 2004 through November 2005 concerning "six or seven

questions" about "the case in general, whether it was discovery. . . . to understand

exactly how much information relating to damages would be required of me at that first

deposition"; and (3) Plaintiff's telephone message left for counsel for Original

Defendants in which he stated, "I finally got a chance to talk <u>with my counsel</u>."  (<u>Id.</u> and

sources cited therein.)

A claim for fraud on the court "is justified only by the most egregious misconduct

directed to the court itself, such as bribery of a judge or jury or fabrication of evidence

12

by counsel." <u>Pfizer, Inc. v. Int'l Rectifier Corp.</u>, 538 F.2d 180, 195 (8th Cir. 1976), <u>cert. denied</u>, 429 U.S. 1040 (1977).  Courts require "clear, unequivocal and convincing" evidence to prove up a fraud on the court claim.  <u>Id.</u>  The fraud must stem from conduct that "improperly influence[d] or impair[ed] the court's function."  <u>Id.</u>

Original Defendants contend that by seeking advice of counsel for $5,000 or less worth of services over the course of this litigation—soon to be entering its third year on the Court's docket—Plaintiff has engaged in "fabrication of evidence."  (Doc. No. 174 at 5.)  This is a preposterous assertion.  The Court finds that Plaintiff, in at least one telephone conference before this Court and at the motion hearing on this motion, has been completely forthright about the limited role that attorneys have played in Plaintiff's case.  The Court finds no reason to believe that outside counsel have written any of the numerous pleadings, motions, or briefs submitted to this Court by Plaintiff, and Original Defendants do not suggest otherwise.  While the Court understands that it is important that Original Defendants' counsel know whether Plaintiff is represented by counsel in order to comply with their professional obligation to not communicate with parties represented by counsel, the Court finds that this concern hardly warrants a charge of fraud on the Court.  Furthermore, the Court finds that Original Defendants' contentions are wholly unsupported and, in fact, belied when viewed in light of the extensive record of Plaintiff's pro se filings, oral arguments, and the record as a whole.  Original Defendants cite no law prohibiting a pro se plaintiff from engaging the services of attorneys for very limited and discrete purposes.  The Court finds no error, much less fraud, in Plaintiff's conduct and cautions Original Defendants that, in the future, such unsupported assertions will not be treated lightly by this Court.

13

### 2.    Dismissal of Individual Defendants

Original Defendants also argue that the individual defendants Steven Parker, Richard Jones, and David Sprouse should be dismissed for lack of jurisdiction because (1) the individual defendants have never been personally served with a summons or complaint; and (2) the law of the case bars Plaintiff's claims because the Court has already determined that 47 U.S.C. §§ 217 and 411 do not provide for individual liability. (Doc. Nos. 124 at 12-13, 174 at 16-19.)  Plaintiff concedes that the individual defendants have not been served but asserts the Court should either consider the need for such service waived because they answered the Amended Complaint and Fifth Amended Complaint or allow Plaintiff to now serve the Fifth Amended Complaint on the individual defendants.  (Doc. No. 149 at 14.)  Plaintiff does not respond to Original Defendants' law of the case attack, but renews his argument that the text of 47 U.S.C. §§ 217 and 411 provide for individual liability.  (Id. at 14-18.)

While Original Defendants do not state a specific procedural basis for their challenges, the Court construes their argument that the claims should be dismissed for failure to serve the individual defendants as a motion to dismiss for insufficiency of service of process pursuant to Federal Rule of Civil Procedure 12(b)(5) and their argument that the claims should be dismissed under the law of the case as a motion to dismiss for failure to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

a.     **Failure to Serve Summons and Complaint on Individual Defendants**

Original Defendants argue that the claims against the individual defendants should be dismissed because Plaintiff never served them with a summons or any of the complaints filed in this action.  (Doc. No. 124 at 12.)  Plaintiff does not dispute this defect but instead argues that Original Defendants waived this argument by answering the Amended Complaint on January 20, 2004 and by answering the Fifth Amended Complaint on October 31, 2005.  (Doc. No. 149 at 14.)

On November 17, 2003, Plaintiff filed an Amended Complaint in which he named, for the first time, the individual defendants Steven Parker, Richard Jones, and David Sprouse.  (Doc. No. 23.)  The individual defendants did not interpose a motion to dismiss but instead, on January 20, 2004,  filed their Answer to the Amended Complaint.  (Doc. No. 26.)  Nowhere in their Answer did individual defendants object to not having been served with the Amended Complaint or raise any other personal jurisdiction objections.  (See id.)  In fact, the individual defendants did not formally raise their objections for lack of proper service until November 1, 2005 when they filed their Motion to Dismiss, based, in part, on Plaintiff's failure to serve them with a summons and complaint for any of the complaints filed in this case.  (See Doc. Nos. 122, 124.)

To be effective, a motion to dismiss all or part of a pleading based upon insufficiency of service of process must be raised in the moving party's first response to that pleading.  Fed. R. Civ. P. 12(h)(1) ("A defense of . . . insufficiency of service of process is waived . . . if it is neither made by motion under this rule nor included in a responsive pleading . . . .").  Here, the individual defendants' first response was their

January 20, 2004 Answer to the Amended Complaint.  By not objecting to the

insufficiency of service of process at that time, they waived their right to do so in the

future.  See Yeldell v. Tutt, 913 F.2d 533, 539 (8th Cir. 1990); Alger v. Hayes, 452 F.2d

841, 844 (8th Cir. 1972).  Furthermore, even if the individual defendants had asserted

such a defense in their January 20, 2004 Answer, their failure to raise the issue by

formal motion for over twenty-one months would serve as a waiver of such a defense.

Neirbo Co. v. Bethlehem Shipbuilding Corp., 308 U.S. 165, 168 (1939) (noting that the

right to challenge defective service, "[b]eing a privilege . . . may be lost.  It may be lost

by failure to assert it seasonably, by formal submission in a cause, or by submission

through conduct."); Datskow v. Teledyne, Inc., 899 F.2d 1298, 1303 (2d Cir. 1990)

(noting that waiver of defense of defective service occurred where defense was stated

in answer but not raised in a motion to dismiss until four months after the answer was

filed), cert. denied, 498 U.S. 854 (1990); Network Prof'ls, Inc. v. Network Int'l, Ltd., 146

F.R.D. 179, 181-82 (D. Minn. 1993) (citing Neirbo for the same proposition).  The Court

finds that the individual defendants cannot now revive what they have long since

waived.

### b.    Failure to State a Claim Against Individual Defendants

Plaintiff contends that the respondeat superior provision of the statutory scheme,

codified at 47 U.S.C. § 217, "explicitly provides for [individual] liability" and that the

provision authorizing joinder of certain parties, codified at 47 U.S.C. § 411, supports this

contention.  (Doc. No. 149 at 16-18.)  Section 217 provides:

Agents' acts and omissions; liability of carrier

In construing and enforcing the provisions of this chapter, the act, omission,

16

or failure of any officer, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or user as well as that of the person.

47 U.S.C. § 217.  Section 411 provides:

Joinder of parties

(a) In any proceeding for the enforcement of the provisions of this chapter, whether such proceeding be instituted before the Commission or be begun originally in any district court of the United States, it shall be lawful to include as parties, in addition to the carrier, all persons interested in or affected by the charge, regulation, or practice under consideration, and inquiries, investigations, orders, and decrees may be made with reference to and against such additional parties in the same manner, to the same extent, and subject to the same provisions as are or shall be authorized by law with respect to carriers.

As used in the above statutes, the term "common carrier" or "carrier" means "any person engaged as a common carrier for hire, in interstate . . . communication by wire or radio."  47 U.S.C. § 153(10).  The term "person" includes "an individual, partnership, association, joint-stock company, trust, or corporation."  Id. § 153(32).

Plaintiff argues that it is significant that § 217 provides that "as well as that of the person," an act of an employee or other person acting for a carrier and within the scope of his employment shall be deemed to be an act of the carrier.  (Doc. No. 149 at 16.)  This argument fails for three reasons.  First, the Court finds that § 217 is, in essence, a provision codifying the common law respondeat superior doctrine.  The term "carrier," of course, does include any individual engaged as a common carrier for hire, thus, an individual acting in such a capacity could be subject to the provisions of § 217.  Other than generic references to the conduct of "Defendants," Plaintiff sets forth few factual allegations that the individual defendants engaged in any conduct at all, much less

17

conduct consistent with a person engaged as a common carrier for hire.  In fact, Plaintiff

alleges that the Disputed Numbers were in the "possession" of either Defendant 800

Ideas.com or Defendant 1-800 San Diego, Inc. or some other corporate entity at all

relevant times.  (See, e.g., Fifth Amend. Compl. ¶¶ 151-157.)  Therefore, any conduct

concerning the warehousing, hoarding, brokering,    violation of lag time regulations, or

first come first served regulations by the individual defendants would have been as

employees or agents of the companies and in furtherance of those companies' ends

and not as individuals engaged as common carriers for hire.

Second, while some courts have determined that statutory provisions which also

include "an individual" in the definition of a "person" authorize "individual liability," they

have done so where Congress has expressly provided for the liability of "persons," such

as in the Cable Communications Act, the relevant provision of which is codified at 47

U.S.C. § 553.  For example, 47 U.S.C. § 553(a) provides in relevant part:

> (1) No person shall intercept or receive or assist in intercepting or receiving
> any communications service offered over a cable system, unless specifically
> authorized to do so by a cable operator or as may otherwise be specifically
> authorized by law.

(emphasis added).  Noting that the applicable definition of "person" includes "an

individual," several courts have determined that § 553 provides for individual liability.

See, e.g., Comcast v. TKA Elecs., Inc., Civ. No. 02-429, 2005 WL 2170092, at *6 (D.

Neb. Sept. 2, 2005) ("[T]he act provides for individual liability."); Comcast v. Platinum

Elecs., Inc., 336 F. Supp. 2d 957, 965 (D. Neb. 2004) ("[T]he act provides for individual

liability."); Kingvision Pay Per View, Ltd v. Myths, Inc., Civ. No. 99-7718, 2001 WL

218909, *2 (N.D. Ill. Mar. 5, 2001) (noting that personal liability exists under § 553).

These cases demonstrate that when Congress has authorized the kind of individual

liability Plaintiff seeks here, Congress expresses its intent by explicitly prohibiting a

"person" from engaging in certain conduct.

Third, Congress has provided that the definition of a "person" set forth in § 153

and cited by Plaintiff applies "unless the context otherwise requires."  47 U.S.C. § 153.

The Court finds that the context of the common carrier regulations provided for in 47

U.S.C. §§ 201-217, does not support Plaintiff's interpretation of a "person" which would

extend liability beyond an individual "engaged as a common carrier for hire" and impose

liability on the employees and/or officers of such common carriers who have only

engaged in such conduct through and for a corporation.  Plaintiff's definition fails

because the context requires a narrower reading of the definition of "person" set forth in

§ 153 than he proposes.

Given the above findings, the individual defendants are entitled to summary

judgment in their favor.  Therefore, the Court recommends dismissing this action

against the individual defendants.  The Court need not and does not reach the issue of

whether the law of the case would be an adequate basis to dismiss Plaintiff's claims.

### 3.    Transfer

Original Defendants request, in the alternative to dismissal, that the case be

transferred to California pursuant to 28 U.S.C. § 1404(a).  (Doc. No. 124 at 14-17.)

Section 1404(a) of Title 28 of the United States Code provides:

> For the convenience of parties and witnesses, in the interest of justice, a
> district court may transfer any civil action to any other district or division
> where it might have been brought.

"[S]ection 1404(a) accords [a] district court much discretion in deciding such motions."

Terra Int'l, Inc. v. Miss. Chem. Corp., 119 F.3d 688, 697 (8th Cir. 1997), cert. denied, 522 U.S. 1029 (1997).  "The party seeking transfer bears the heavy burden of showing that the balance of factors strongly favors the movant,"[2] United Mortgage Corp. v. Plaza Mortgage Corp., 853 F. Supp. 311, 315 (D. Minn. 1994), and "federal courts give considerable deference to a plaintiff's choice of forum."  Terra Int'l, 119 F.3d at 695. Therefore, an order to transfer venue "should not be freely granted."  In re Nine Mile Ltd., 692 F.2d 56, 61 (8th Cir. 1982) (per curiam), abrogation on other grounds recognized by, Mo. Housing Dev. Comm'n v. Brice, 919 F.2d 1306, 1311 (8th Cir.1990).

In ruling on a motion to transfer, courts consider three general factors: (1) convenience of the parties; (2) convenience of the witnesses; and (3) the interests of justice.  28 U.S.C. section 1404(a).  Beyond these factors, a court must make "a case-by-case evaluation of the particular circumstances at hand and a consideration of all relevant factors" to arrive at an equitable decision.  E.g., Terra Int'l, 119 F.3d at 691 (citing Stewart Org., Inc v. Ricoh Corp., 487 U.S. 22, 29 (1988)).[3]

---

[2] Although the notion that a very strong showing must be made comes from Gulf Oil Corp. v. Gilbert, 330 U.S. 501 (1947), a case discussing forum non conveniens, this District still requires a strong showing that transfer is favored while cognizant of the fact that a lesser showing is required than under the doctrine of forum non conveniens.  See Brockman v. Sun Valley Resorts, Inc., 923 F. Supp. 1176, 1178-80 (D. Minn. 1996); K-Tel Int'l, Inc. v. Tristar Prod., Inc., 169 F. Supp. 2d 1033, 1045 (D. Minn. 2001); Graff v. Qwest Comm. Corp., 33 F. Supp. 2d 1117, 1121 (D. Minn. 1999).

[3] Original Defendants do not cite to any affidavits, depositions, or other exhibits in support of their motion to transfer.  The Court notes that this failure, alone, warrants denial of their motion.  See Reid-Walen v. Hansen, 933 F.2d 1390, 1397 n.10 (8th Cir. 1991); Plum Tree, Inc. v. Stockment, 488 F.2d 754, 756 (3rd Cir. 1973); Surco Products, Inc. v. Theochem Laboratories, Inc., 528 F. Supp. 677, 679 (S.D. Fla. 1981).

Under the "convenience of the parties" factor, the "normal presumption [is] in favor of a plaintiff's choice of forum" especially "where the plaintiff resides in the district in which the lawsuit was filed."  Graff v. Qwest Comm. Corp., 33 F. Supp. 2d 1117, 1121 (D. Minn. 1999) (citations omitted); see also K-Tel Int'l, Inc. v. Tristar Prod., Inc., 169 F. Supp. 2d 1033, 1045 (D. Minn. 2001).  Moreover, transferring venue to a court that merely shifts the inconvenience from one party to another is wholly inappropriate.  E.g., Terra Int'l, 119 F.3d at 696-97; Alternative Pioneering Sys. v. Direct Innovative Prods., Inc., Civ. No. 4-92-278, 1992 WL 510190, at *5 (D. Minn. Aug. 20, 1992).  Rather, transfer should be made only to a more convenient forum for the parties, "not to a forum likely to prove equally convenient or inconvenient."  Van Dusen v. Barrack, 376 U.S. 612, 646 (1964).

When considering the "convenience of the witnesses" factor, relevant considerations include the number of non-party witnesses, the location of all witnesses, the preference of courts for live testimony as opposed to depositions, e.g., K-Tel Int'l, 169 F. Supp. 2d at 1045, and other issues concerning the "relative ease of access to sources of proof."  Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947).  This factor, however, "should not be determined solely upon a contest between the parties as to which of them can present a longer list of possible witnesses located in the respective districts; the party seeking the transfer must clearly specify the essential witnesses to be called and must make a general statement of what their testimony will cover."  Nelson v. Master Lease Corp., 759 F. Supp. 1397, 1402 (D. Minn. 1991); see also Scheidt v.

Klein, 956 F.2d 963, 966 (10th Cir. 1992); NEO Corp. v. Fortistare Methane, LLC, Civ. No. 01-168 JRT/FLN, 2001 WL 1640061, at *4 (D. Minn. Sept. 6, 2001).

Under the "interests of justice" factor, a court may consider, among other things, the plaintiff's choice of forum, judicial economy, the parties' ability to bear the costs of litigating in each forum, obstacles to a fair trial, conflict of law issues, and advantages of having a local court determine local law.  E.g., Terra Int'l, 119 F.3d at 696.

### a.    **Convenience of the Parties**

Here, Plaintiff is a citizen of Minnesota and, therefore, Plaintiff's choice of this forum is entitled to particular deference.  E.g., Graff, 33 F. Supp. 2d at 1121.   Original Defendants contend that all of the defendants are citizens of California and have little or no contact with Minnesota.  (Doc. No. 124 at 14.)  Because transferring venue to a court that merely shifts the inconvenience from one party to another is wholly inappropriate, e.g., Terra Int'l, 119 F.3d at 696-97; Alternative Pioneering Sys. v. Direct Innovative Prods., Inc., 1992 WL 510190, *5 (D. Minn. Aug., 20, 1992), the Court finds that this factor does not support transfer of the action.

### b.    **Convenience of the Witnesses**

Federal courts "much prefer the presentation of live testimony to depositions." Coast-to-Coast Stores, Inc. v. Womack-Bowers, Inc., 594 F. Supp. 731, 734 (D. Minn. 1984); accord Terra Int'l, 119 F.3d at 696-97; Graff, 33 F. Supp. 2d at 1122.  Here, Original Defendants contend that "witnesses would conceivably include" the individual defendants, staff persons for non-party corporation Communication Management Services (CMS), and technicians with whom 1-800 Ideas.com. Inc. has contracted.

22

(Doc. No. 124 at 16.)  Plaintiff responds that he "has no present intention to call any CMS employees" and argues that Original Defendants fail to indicate where their technical experts reside.  (Doc. No. 149 at 20.)  He also states that Original Defendants have previously indicated that only the individual defendant Richard Jones has first-hand knowledge of the relevant business operations.  (Id.)  Plaintiff represents that his "expert witness, Dr. Meitzen, would be required to seek and procure new counsel admitted to the California bar should the case be moved to California."  (Id. at 21.)

After review of these arguments, the Court finds that, while arguably more witnesses are located in California than Minnesota, the convenience of the witnesses factor does not strongly favor transfer of the action to California.

### c.   Interests of Justice

"The interest of justice factor is weighed very heavily," Graff, 33 F. Supp. 2d at 1122, and a court may consider a variety of factors including the plaintiff's choice of forum, judicial economy, the parties' ability to bear the costs of litigating in each forum, obstacles to a fair trial, conflict of law issues, and advantages of having a local court determine local law.  E.g., Terra Int'l, 119 F.3d at 696.  Original Defendants contend that the burden of defending this action in Minnesota "is far greater" than Plaintiff's burden of proceeding pro se in Minnesota and argue that the claims do not present issues that a Minnesota court is uniquely qualified to adjudicate.

Minnesota is Plaintiff's forum of choice.  While the Court agrees with Original Defendants that a court in California could competently interpret and apply the relevant law, other considerations weigh in favor of this forum.  The events which precipitated

this lawsuit date back to at least August 2000.  Plaintiff commenced this action on June 5, 2003.  (Doc. No. 1.)  Both this Court and the trial court have invested significant time and resources in adjudicating the pretrial issues the parties have raised.  The Court finds that transfer of this case would result in further delay of the ultimate resolution of the parties' dispute and would require another court to spend considerable time and effort familiarizing itself with issues that have already been decided and with which this District is well versed.  The Court finds that the interests of judicial economy are best served by retaining the present venue.  Given the above findings, the Court determines that Original Defendants have not met their burden to show that the balance of factors strongly weighs in favor of transfer.

Therefore, the Court recommends granting Original Defendants' Motion to Dismiss (Doc. No. 122) all of Plaintiff's claims against Steven Parker, Richard Jones, and David Sprouse.  The Court recommends denying the motion with respect to all other relief requested.

## B.   Defendant 800-Ideas, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction (Doc. No. 153)

Defendant 800-Ideas, Inc. moves to dismiss for lack of personal jurisdiction all of the claims alleged against it as set forth in the Fifth Amended Complaint.  (Doc. No. 152.)

### 1.   Standard of Review

While the plaintiff always carries the burden of proof, a plaintiff need only produce prima facie evidence of personal jurisdiction over a defendant to survive a

motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure

12(b)(2).  Digi-Tel Holdings, Inc. v. Proteq Telecomm., Ltd., 89 F.3d 519, 522 (8th Cir.

1996); Gould v. P.T. Krakatau Steel, 957 F.2d 573, 575 (8th Cir. 1992), cert. denied,

506 U.S. 908 (1992).  In assessing a plaintiff's evidence, the court views the evidence in

the light most favorable to the plaintiff and resolves all factual conflicts in the plaintiff's

favor.  Digi-Tel Holdings, Inc., 89 F.3d at 522.  Any "doubt[s] should be resolved in favor

of retention of jurisdiction."  V.H. v. Estate of Birnbaum, 543 N.W.2d 649, 653 (Minn.

1996).  When considering whether personal jurisdiction exists, the court may consider

matters outside the pleadings.  Stevens v. Redwing, 146 F.3d 538, 546 (8th Cir. 1998)

(citing Land v. Dollar, 330 U.S. 731, 735 n. 4 (1947) (noting that "when a question of the

District Court's jurisdiction is raised . . . the court may inquire by affidavits or otherwise,

into the facts as they exist" and "the mode of its determination is left to the trial court")).[4]


## 2.    Due Process and Personal Jurisdiction

This Court has personal jurisdiction over a foreign defendant if a state court in

Minnesota would also have jurisdiction.  See Digi-Tel Holdings, Inc., 89 F.3d at 522.

Minnesota's reach over foreign defendants extends to the fullest extent permitted by the

United States Constitution.  See Soo Line R.R. Co. v. Hawker Siddeley Canada, Inc.,

---

[4] "While in some cases it is more appropriate to test jurisdictional facts upon the proof adduced after full discovery, the court may properly address itself to the jurisdictional issue at any earlier stage of the proceedings where the affidavits and other exhibits presented on motion and opposition thereto make the issue ripe for early determination."  Block Industries v. DHJ Industries, Inc., 495 F.2d 256, 259 n.3 (8th Cir. 1974) (citations omitted).

25

950 F.2d 526, 528 (8th Cir. 1991) (citing Rostad v. On-Deck, Inc., 372 N.W.2d 717, 719 (Minn. 1985) (en banc), cert. denied, 474 U.S. 1006 (1985)).

"[T]he constitutional touchstone [of personal jurisdiction] remains whether the defendant purposefully established 'minimum contacts' in the forum State." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). "Th[e] 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." Id. at 475 (citations omitted). Thus, for the Court to acquire jurisdiction over a non-resident defendant, the defendant's contacts with Minnesota "must be sufficient to cause the defendant to 'reasonably anticipate being haled into court'" in Minnesota. Epps v. Stewart Info. Servs. Corp., 327 F.3d 642, 648 (8th Cir. 2003) (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).

The Eighth Circuit considers the following factors in determining whether personal jurisdiction is proper: (1) the nature and quality of the contacts with the forum state; (2) the quantity of contacts with the forum state; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties. Dakota Indus., Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1390 (8th Cir. 1991). The first three factors are primary factors, the remaining two are secondary factors. Id. The Court looks to all of the contacts in the aggregate and examines the totality of the circumstances in making its determination. Northrup King. Co. v. Compania Productora Semillas Algodoneras, S.A., 51 F.3d 1383, 1388 (8th Cir. 1995).

The third factor, the relation of the cause of action to the contacts, distinguishes whether the jurisdiction is specific or general. See Digi-Tel Holdings, Inc., 89 F.3d at 522 n.4.  "Specific jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant's actions within the forum state while general jurisdiction refers to the power of a state to adjudicate any cause of action involving a particular defendant regardless of where the cause of action arose." Id.

       **3.**      **Nature, Quality, and Quantity of Contacts, and the Relation of the Cause of Action to the Contacts with Minnesota**

800-Ideas, Inc. is a Nevada Corporation with its principle place of business in San Diego, California.  (Fifth Amend. Compl. ¶ 14; Parker Aff. ¶ 5.)  Susan Parker is President and sole shareholder of 800-Ideas, Inc.  (Fifth Amend. Compl. ¶ 18.)  Parker submitted an affidavit in which she states that she has no connections with Minnesota and that she has never either individually or in her capacity as sole shareholder, officer, and director of 800-Ideas, Inc.: (1) visited Minnesota, (2) entered into a contract in Minnesota, (3) acquired or owned real property in Minnesota, or (4) done business in Minnesota.  (See Parker Aff. at 1-3.)  Further, Parker states that she has been the sole shareholder of 800-Ideas, Inc. since approximately 1995 and is currently the only director, officer, and/or employee of 800-Ideas, Inc.  (Id. ¶¶ 6-7.)  Parker states that she is unaware of 800-Ideas, Inc. ever having had any connections with Minnesota or ever having: (1) maintained an office or business of any kind in Minnesota, (2) entered into a contract in Minnesota, (3) owned real estate in Minnesota, (4) done business in Minnesota.  (Id.)  800-Ideas, Inc. contends further that none of the allegations set forth

in the Fifth Amended Complaint tie 800-Ideas, Inc. to Minnesota.  (Doc. No. 155 at 4.)

Plaintiff responds that the following evidence demonstrates that this Court has personal jurisdiction over 800-Ideas, Inc.:

1.      In 1993, 800-Ideas, Inc. acquired the disputed 800 number and became the listed subscriber for that number in the SMS database.

2.      If ever an affiliation existed between 800-Ideas, Inc. and 1-800 Ideas.com, Inc., that affiliation was terminated prior to the end of 1995.

3.      In 1997, 800-Ideas, Inc. began providing telecommunications services to Choice Mortgage USA, Inc., an unaffiliated New Hampshire Corporation.

4.      At least through June 26, 2001, 800-Ideas, Inc. was invoiced for the disputed 800 number and numerous other toll-free numbers.

5.      In 2002, either 800-Ideas, Inc. or 1-800 Ideas.com, Inc. began providing telecommunications services to 1-800 San Diego, Inc., a California Corporation unaffiliated with 800-Ideas, Inc.

6.      In 2004, 800-Ideas, Inc. was listed as the subscriber in the SMS 800 database for the disputed 800 number.

(See Doc. No. 170 at 4.)

Assuming, arguendo, that the above assertions are true, the Court finds that none of them assert that 800-Ideas, Inc. purposefully contacted Minnesota.  In fact, the above allegations do not assert 800-Ideas, Inc. had any connection to Minnesota at all. Plaintiff alleges that, on August 6, 2000, he contacted a local responsible organization,

Qwest Communications, to secure the 800-246-4238 and 888-246-4238 numbers.
(Fifth Amend. Compl. ¶ 47.)  Qwest told Plaintiff that 1-800 Ideas.com was the
subscriber listed for the 888 number.  (Id. ¶ 50.)  Plaintiff contends, thereafter, he
initiated a search to find the subscriber listed for the 800 number.  (Id. ¶ 52.)  According
to Plaintiff, this search led him to Communications Management Services which later
indicated that 800 Ideas.com was the responsible Organization for both the 888 and the
800 number.  (Id. ¶ 63.)  Plaintiff has not alleged that 800-Ideas, Inc. advertised in
Minnesota or otherwise tried to contact him or any other potential Minnesota customer
or had any other contact with Minnesota.

Given the above, the Court finds that consideration of the first three, and primary,
factors—nature and quality of the contacts, quantity of the contacts, and the relation of
the cause of action to the contacts with Minnesota—demonstrates that this Court does
not possess personal jurisdiction over 800-Ideas, Inc.

### 4.      Forum State's Interest and the Convenience of the Parties

While Minnesota has an interest in providing a forum for its citizens, the Court
finds that this factor does not outweigh the first three factors, which all weigh in favor of
dismissal of 800-Ideas, Inc. from this action for want of personal jurisdiction.
Additionally, the Court finds that consideration of the convenience of the parties does
not weigh in favor of either Plaintiff or 800-Ideas, Inc.

Therefore, the Court finds that it has no in personam jurisdiction over 800-Ideas,
Inc. and recommends granting Defendant 800-Ideas, Inc.'s Motion to Dismiss for Lack
of Personal Jurisdiction (Doc. No. 153).  Should the trial court adopt this

29

recommendation, the issues raised in Plaintiff's unnoticed Motion for Summary Judgment Against 800 Ideas, Inc. (Doc. No. 172) would be mooted because 800 Ideas, Inc. would no longer be in this lawsuit.  Therefore, the Court also recommends denying as moot Plaintiff's Motion for Summary Judgment on his claims against 800 Ideas, Inc. (Doc. No. 172).

### C.   Plaintiff's Motion for Summary Judgment (Doc. No. 143)

Plaintiff moves for summary judgment in his favor against Original Defendants on all five counts of his Fifth Amended Complaint: Warehousing, Hoarding, Brokering, Violation of Lag Time Regulations, and Violation of First Come First Served Regulations.  (Doc. No. 145 at 1.)  There are two initial matters that the Court must address: (1) Original Defendants' contention, leveled in its Response in Opposition to Plaintiff's Motion for Summary Judgment, that it has presented to the Court a cross-motion for summary judgment in its favor on all of Plaintiff's claims (its second summary judgment motion)[5]; and (2) Plaintiff's reliance on Original Defendants' conduct concerning telephone numbers other than the Disputed Numbers in support of his motion for summary judgment.

First, Plaintiff objects to Original Defendants' contention that they have a properly served and filed cross-motion for summary judgment before the Court (see Doc. No.

---

[5] Original Defendants filed their first Motion for Summary Judgment on December 1, 2004.  (Doc. No. 72.)  In that motion, Original Defendants, inter alia, argued: "Based on a careful review of the facts of the present matter, no material factual issues remain in dispute concerning alleged claims embodied in Counts: 1) Warehousing; 2) Hoarding; and 3) Brokering; or in 5) Lag Time regulations; and 6) breach of first come first serve regulations."  (Doc. No. 74 at 1.)

167 at 2).  District of Minnesota Local Rule 7.1(b)(1) provides: "No [dispositive] motion

shall be heard by a district judge unless the moving party files and serves [a motion,

notice of motion, memorandum of law, affidavit and exhibits, and proposed order] at

least 45 days prior to the hearing."  Arguably, Original Defendants' Response in

Opposition to Plaintiff's Motion for Summary Judgment is a memorandum of law in

support of summary judgment in their favor and affidavits and exhibits are attached

thereto.  Original Defendants, however, have not filed a notice of motion, motion, or

proposed order in support of summary judgment in their favor.  Moreover, even if they

had filed the missing documents along with their Response in Opposition to Plaintiff's

Motion for Summary Judgment, that memorandum was filed less than thirty days before

the motion hearing, not forty-five days as required by the local rules.  Thus, the Court

finds that no such motion was ever filed and, therefore, there is no cross-motion by

Original Defendants before the Court.[6]  Below, then, the Court addresses only Plaintiff's

Motion for Summary Judgment (Doc. No. 143).

Second, Original Defendants object to Plaintiff's citation to telephone numbers

---

[6] The Court notes that on December 1, 2004, Original Defendants did file a
Motion for Summary Judgment (Doc. No. 72) on the same issues they now claim they
are entitled to judgment as a matter of law (in their December 16, 2005 responsive
brief).  The Court denied Original Defendants' Summary Judgment Motion.  (Doc. No.
103.)  At the motion hearing on Plaintiff's Motion for Summary Judgment (Doc. No.
143), Original Defendants argued that the cited case law in their responsive
memorandum supported their position that their responsive memorandum could be
construed as a motion for summary judgment.  The Court has reviewed the cases cited,
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) and Krenik v. County of Le
Sueur, 47 F.3d 953, 957 (8th Cir. 1995).  These cases do not support Original
Defendants' argument.  In each case, the party moving for summary judgment, unlike
Original Defendants here, had properly presented the Court with a summary judgment
motion.

other than the Disputed Numbers to "bolster" his allegations concerning the Disputed

Numbers.  The Court agrees with Original Defendants that their conduct with respect to

other numbers cannot, ultimately, be the basis for their liability.  Plaintiff must show that

there is no genuine issue as to any material fact about the Disputed Numbers and that

he is entitled to a judgment as a matter of law as to the Disputed Numbers.  But Original

Defendants' conduct with respect to other numbers is relevant to the context in which

Plaintiff's claims arise and is relevant to determining if the rebuttable presumptions

described in the FCC regulations apply in this case.  Thus, in ruling on each of the

claims alleged by Plaintiff, the Court does consider Original Defendants' conduct as it

relates to toll-free numbers other than the Disputed Numbers.

### 1.   <u>Warehousing</u>

Plaintiff contends that 1-800 Ideas.com, Inc. warehoused the disputed <u>800</u>

<u>number</u> from <u>March 15, 2001 through March 2002</u> and warehoused the disputed <u>888</u>

<u>number</u> from <u>at least the time 1-800 Ideas.com, Inc. became the Responsible</u>

<u>Organization for the 888 number through March 2002</u>.  (Doc. No. 145 at 3, 10.)  Plaintiff

does not seek summary judgment on the warehousing claim for any other time period.

(<u>Id.</u>)

The relevant "warehousing" provision of the Code of Federal Regulations

provides:

> (a) As used in this section, warehousing is the practice whereby Responsible
> Organizations, either directly or indirectly through an affiliate, reserve toll free
> numbers from the Service Management System database without having <u>an</u>
> <u>actual toll free subscriber</u> for whom those numbers are being reserved.
> (b) Responsible Organizations shall not warehouse toll free numbers.  There

shall be a rebuttable presumption that a Responsible Organization is warehousing toll free numbers if:

(1) The Responsible Organization does not have an identified toll free subscriber agreeing to be billed for service associated with each toll free number reserved from the Service Management System database; or

(2) The Responsible Organization does not have an identified toll free subscriber agreeing to be billed for service associated with a toll free number before switching that toll free number from reserved or assigned to working status.

(c) Responsible Organizations shall not maintain a toll free number in reserved status if there is not a prospective toll free subscriber requesting that toll free number.

(d) A Responsible Organization's act of reserving a number from the Service Management System database shall serve as that Responsible Organization's certification that there is an identified toll free subscriber agreeing to be billed for service associated with the toll free number.

47 C.F.R. § 52.105 (emphasis added).  In sum, warehousing occurs where (1) a Responsible Organization, (2) reserves a toll-free number from the SMS, (3) without having an "actual subscriber."  Id.  "A finding that toll-free numbers have been activated and used by a subscriber does not preclude a finding that the subscriber has engaged in warehousing or hoarding."  Patients Plus, Inc. v. Long Distance Telecomms. Serv., Inc., 12 F.C.C.R. 13258, 13275-77 (1997).

Original Defendants concede that 1-800 Ideas.com, Inc. has been the Responsible Organization for the Disputed Numbers since approximately June, July, or August of 2000.  (Doc. No. 134 ¶ 99 ("The Original Defendants admit the allegations of Paragraph 99, that as of August 2000, 800 Ideas.com, Inc. was both the Responsible Organization and subscriber of the two Disputed Numbers."); Doc. No. 167 at 28 ("800 Ideas.com, Inc. initially subscribed to the Disputed Numbers utilizing Sprint as its

RespOrg, then CMS , and finally in approximately June-July of 2000, 800

Ideas.com, Inc. became a RespOrg itself.")[7]   Nor is there any dispute that 1-800

Ideas.com, Inc. reserved the Disputed Numbers from the SMS database.  Original

Defendants, however, claim that 1-800 Ideas.com, Inc. has been the subscriber of the

Disputed Numbers from March 15, 2001 through March 2002.  (See Fifth Amend.

Compl. ¶ 99; Doc. No. 134 ¶ 99.)

Original Defendants filed the affidavit of 800 Ideas.com, Inc.'s employee Richard

Jones in which Jones states the Disputed Numbers have been utilized by three different

entities during 1-800 Ideas.com, Inc.'s subscribership: (1) from August 6, 2000 through

about March 15, 2001, "Choice USA Mortgage utilized the disputed toll-free numbers";

(2) from about March 15, 2001 through approximately March 13, 2002, 1-

800.Ideas.com, Inc. utilized the Disputed Numbers "in the course of its normal business

practices"; (3) from about March 13, 2002 through the date of this Report and

Recommendation, 1-800 San Diego Inc. has been utilizing the Disputed Numbers "as a

key part of their business plan."    (Doc. No. 146 ¶¶ 6-8.)  After the Jones affidavit was

filed, Original Defendants filed the affidavit of 1-800 Ideas.com, Inc.'s Chairman, Steven

Parker, in which Parker states that Choice USA Mortgage "never assumed use of the

888 Disputed Number and only utilized the 800 Disputed Number, and [1-800

---

[7] The Court notes that 1-800 Ideas.com, Inc.'s Chairman of the Board had previously represented, in his December 1, 2004 affidavit, that 1-800 Ideas.com, Inc. was the Responsible Organization for the disputed 800 number since April 10, 2001 and for the disputed 888 number since February 20, 2001 and that before that Sprint and Communications Management Services had been the Responsible Organizations for the Disputed Numbers.  (See Doc. No. 184 Ex. B ¶ 45.)

Ideas.com] continued to subscribe to the 888 Disputed Number as part of its marketing and service consulting efforts."  (Doc. No. 168 at 47.)

Plaintiff cites in support of his motion, the 800 Service Management System or SMS database records provided to him by Original Defendants.  (Doc. No. 145 at 10.) Original Defendants do not dispute that the SMS records show that 1-800 Ideas.com is the Responsible Organization for 6,861 toll-free numbers.  (<u>See</u> Doc. No. 146 Ex. 9.) Original Defendants claim they are the actual subscribers of all 6,861 numbers.  (See Doc. No. 167 at 30 ("Toll-free numbers utilized by 800 Ideas.com, Inc. are subscribed to by 800 Ideas.com, Inc. . . . At all times, 800 Ideas.com, Inc. has remained the 'toll-free subscriber' as defined by the FCC of the various toll-free numbers it utilizes in the course of its business activities.")  Parker asserts that, "[o]ver the last nine plus years, 800 Ideas.com has worked with over 1000 clients around the country to develop and implement marketing programs which utilize mnemonic toll-free numbers as a focal point of the marketing programs."  (Doc. No. 168 Ex. B ¶ 6.)  Plaintiff asserts that, assuming "that as many as 2,000 of the 6,861 toll-free numbers for which [1-800 Ideas.com, Inc.] is the Resp Org are currently in use by actual subscribers, there remain 4,861 or more toll-free numbers in the Defendants' warehouse, just waiting for 'a potential subscriber [to] contact 800 Ideas.com' before they may be used by that potential actual subscriber."  (Doc. No. 145 at 10.)

Based on the above evidence and for purposes of this motion, Plaintiff contends that 1-800 Ideas.com, Inc. warehoused the disputed <u>800 number</u> from <u>March 15, 2001 through March 2002</u> and warehoused the disputed <u>888 number</u> from <u>at least the time 1-</u>

<u>800 Ideas.com, Inc. became the Responsible Organization for the 888 number through March 2002</u>.  (Doc. No. 145 at 3, 10.)  The questions before the Court are whether 1-800 Ideas.com, Inc. (1) reserved the disputed 800 number from the Service Management System database from March 15, 2001 through March 2002 without having an actual toll free subscriber for whom that number was being reserved; and (2) reserved the disputed 888 number from the Service Management System database from August 9, 2000 through March 2002 without having an actual toll free subscriber for whom that number was being reserved.

Original Defendants do not contest Plaintiff's assertion that as many as 2,000 toll-free numbers are utilized exclusively by 1-800 Ideas.com, Inc. to market its services. Parker contends that, "in every instance where [1-800 Ideas.com, Inc.] has a toll-free number in use as part of the marketing of its own services," it pays "the underlying carrier for every call and every minute of usage made to and through the toll-free number."  (Doc. No. 168 Ex. B ¶ 24.)  The "services" it markets are marketing plans and the ability, "[b]y means of its specialized computer and telecommunications technology" to "share a single 800 number among many businesses located in different parts of the country, and enable each of the businesses to make use of the toll-free number in their specific marketing area."  (<u>Id.</u> ¶¶ 4, 8.)  The service works by routing the call to a toll-free number to 1-800 Ideas.com, Inc.'s "communication equipment in California" which "determines the originating location of the telephone call, and routes the call to the appropriate user for that geographic area" without interruption to the caller.  (<u>Id.</u> ¶ 8.)

According to Parker, 1-800 Ideas.com, Inc.'s service allows a number of

companies to use the same number.  (Id. ¶ 9.)  As part of this business, 1-800 Ideas.com, Inc. has subscribed to a number of toll-free numbers with good mnemonic uses, including the Disputed Numbers.  (Id. ¶ 11.)  Parker states that "1-800 Ideas.com, Inc. "has determined that the best way to place itself in front of potential users of its marketing services is to have callers who are checking to see if a particular mnemonic 800 number is in use" reach 1-800 Ideas.com, Inc. "directly through calling that toll-free number, and communicate directly with [1-]800 Ideas.com about marketing programs and shared uses that could be available on that particular toll-free number."  (Id. ¶ 13.) Parker states:

> When a potential subscriber contacts 800 Ideas.com about a particular mnemonic toll-free number, 800 Ideas.com will work with that customer to develop an appropriate marketing plan based around the mnemonic toll-free number, and will charge the customer for its services in developing the marketing program.

(Id. ¶ 16.)  When a business purchases services from 1-800 Ideas.com, Inc., Parker states that "in all cases, [1-800 Ideas.com, Inc.] is responsible for paying the carrier's charges incurred for usage on that number" and 1-800 Ideas.com, Inc. "in turn provides billing to the user(s) who are sharing that toll-free number."  (Id. ¶ 18.)  "For those numbers where [1-800 Ideas.com, Inc.]  is providing shared use services to one or more of its customers, the toll-free numbers are being used to promote the products or services of the [1-800 Ideas.com, Inc.'s] customer(s) who are subscribers to that particular toll-free number."  (Id. ¶ 29.)

   Plaintiff does not appear to dispute the above description of 1-800 Ideas.com, Inc.'s business strategy.  He does respond without providing a legal citation that "[t]he

aspect of the Defendants' illegal business model that offers shared use of a particular

toll-free number [is] specifically prohibited by the FCC."  (Doc. No. 177 at 21.)  He also

states, "[a] small number" of the numbers to which 1-800 Ideas.com subscribes are

"used to start new internal business activities," and "[t]he vast majority" are "placed in

service such that a person dialing the particular toll-free number" hears "a recorded

solicitation message" for 1-800 Ideas.com, Inc.'s services.  (Doc. No. 145 at 3.)  Plaintiff

argues that 1-800 Ideas.com, Inc.'s business model works by warehousing toll-free

numbers.  Plaintiff cites to Parker's affidavit in which Parker states, "When a potential

subscriber contacts" the business "about a particular mnemonic toll-free number, [1-800

Ideas.com, Inc.] will work with that customer to develop an appropriate marketing plan

based around the mnemonic toll-free number, and will charge the customer for its

services in developing the marketing program."  (Doc. No. 168 Ex. B ¶ 16 (emphasis

added)).  Plaintiff contends that Parker's statement is a concession that 1-800

Ideas.com Inc. warehouses the numbers until an "actual" subscriber comes along,

meaning that 1-800 Ideas.com, Inc. warehoused the Disputed Numbers during the

times he claims.  (Doc. No. 145 at 10.)  Original Defendants vigorously dispute Plaintiff's

characterization of Parker's statement and argue that 1-800 Ideas.com, Inc. is not

waiting for an "actual" subscriber to come along but that 1-800 Ideas.com, Inc. is the

"actual" subscriber.  (Doc. No. 167 at 30.)

        The relevant FCC regulations set forth some definitions, among which are the

following:

> (e) Toll Free Subscriber. The entity that requests a Responsible
> Organization to reserve a toll free number from the SMS database.

(f) Toll Free Number. A telephone number for which the toll charges for completed calls are paid by the toll free subscriber. The toll free subscriber's specific geographic location has no bearing on what toll free number it can obtain from the SMS database.

47 C.F.R. § 52.101.  The Court finds that these definitions anticipate that one and only one "subscriber" (1) requests reservation of the number from a Responsible Organization; and (2) pays for the toll charges on that number.  A Responsible Organization does not appear to be prohibited from also being a toll-free subscriber, and Plaintiff cites no authority to the contrary.  While it <u>appears</u> that 1-800 Ideas.com, Inc. did have "an <u>identified</u> toll free subscriber agreeing to be billed for service associated with each toll free number reserved from the Service Management System database,"—itself—so as not to give rise to a rebuttable presumption, that does not end the Court's inquiry because mere activation and use of a toll-free number "does not preclude a finding that the subscriber has engaged in warehousing."  <u>Patients Plus, Inc.</u>, 12 F.C.C.R. at 13275-77.

The Court finds that the crux of the matter is whether 1-800 Ideas.com, Inc. is acting as an "actual" subscriber for purposes of 47 C.F.R. § 52.105 when it passively markets its services by placing a solicitation on a mnemonically valuable toll-free number, pays the underlying carrier charge, but then, after it secures a "user" for that toll-free number, passes the carrier charge onto the "user" of that number.  The Court finds that there are genuine issues of material fact in dispute concerning Original Defendants' role in this scheme, such as whether 1-800 Ideas.com truly anticipates only a transient use of a number and whether the specific facts of its use of the number

makes 1-800 Ideas.com, Inc. only a nominal subscriber to the toll-free number.  It is not clear to what extent and for how many of the numbers for which it is a Responsible Organization that 1-800 Ideas.com, Inc. purposefully aims merely to secure an end user of the toll-free number.  The Court finds that whether 1-800 Ideas.com was ever an "actual toll free subscriber" as that phrase is used in 47 C.F.R. § 52.105 is an issue for the jury.  The jury will consider, for instance, the statement of 1-800 Ideas.com, Inc.'s chairman of the board, Parker, where he describes 1-800 Ideas.com, Inc. as working with its customers who are "potential subscriber[s]" to mnemonic numbers held by 1-800 Ideas.com, Inc.  (Doc. No. 168 Ex. B ¶16.)

The Court finds that there is a genuine issue of material in fact in dispute about whether the 888 number was reserved solely for the use of 1-800 Ideas.com, Inc. as a nominal subscriber awaiting an actual subscriber from the time 1-800 Ideas.com, Inc. became the Responsible Organization for the 888 number in the summer of 2000 through the time the number was put to use by 1-800 San Diego, Inc. in March 2002. The Court finds that the same is true for the 800 disputed number for at least the period from March 15, 2001 through March 13, 2002, when 1-800 Ideas.com, Inc. may have reserved the 800 number solely as a nominal subscriber awaiting an actual subscriber or as a bonafide actual subscriber itself.  This is a material fact.  Given the above findings, the Court finds that there are genuine issues of material fact in dispute that preclude granting summary judgment for Plaintiff on his claim that 1-800 Ideas.com, Inc. warehoused the 888 number from at least August 2000 through March 2002 and the 800 number from at least March 15, 2001 through March 13, 2002 in violation of 47

C.F.R. § 52.105.  Accordingly, the Court recommends denying summary judgment to

Plaintiff on his claim of warehousing against 1-800 Ideas.com, Inc. as limited to the time

frames described above.

## 2. <u>Hoarding</u>

As with his summary judgment motion on warehousing, Plaintiff limits the time

frame during which he claims summary judgment is appropriate on his hoarding claim.

Plaintiff contends that 1-800 Ideas.com, Inc. hoarded the disputed <u>800 number</u> from

<u>March 15, 2001 through March 2002</u> and hoarded the disputed <u>888 number</u> from <u>at</u>

<u>least the time 1-800 Ideas.com, Inc. reserved the 888 number from the SMS database</u>

<u>until approximately March 2002</u>.  (Doc. No. 145 at 15.)  The relevant "hoarding"

provision of the Code of Federal Regulations provides:

> (a) As used in this section, hoarding is the acquisition by a toll free subscriber from a Responsible Organization of more toll free numbers than the toll free subscriber <u>intends to use for the provision of toll free service</u>. . . .
>
> (1) Toll free subscribers shall not hoard toll free numbers.
>
> . . .
>
> (3) Routing multiple toll free numbers to a single toll free subscriber will create a rebuttable presumption that the toll free subscriber is hoarding . . . toll free numbers.

47 C.F.R. § 52.107 (emphasis added).  Thus, hoarding occurs where (1) a subscriber,

(2) "acquires" a toll free number, (3) that he does not "intend[ ]to use for the provision of

toll free service."  The text of the regulation makes clear that whereas warehousing

concerns a Responsible Organization's unlawful storage of toll-free numbers, hoarding

concerns the conduct of <u>subscribers</u>, whether or not they are Responsible

Organizations.

In this case, 1-800 Ideas.com, Inc. argues that it has been the subscriber to the Disputed Numbers since the time Plaintiff alleges he requested the numbers in August of 2000. (Doc. No. 134 ¶ 99; Doc. No. 167 at 9.) Original Defendants represent that 1-800 Ideas.com, Inc. subscribes to "a number of toll-free numbers" that have "good mnemonic uses." (Doc. No. 168 Ex. B ¶ 11.) Billing records for 1-800 Ideas.com, Inc. show that it is a subscriber to more than 6,000 toll-free numbers. (Doc. No. 146 Ex. 10.) The above evidence arguably demonstrates that multiple toll free numbers have been routed to 1-800 Ideas.com, Inc., therefore, there exists a rebuttable presumption that 1-800 Ideas.com, Inc. is hoarding toll free numbers. 47 C.F.R. § 52.107(a)(3). Original Defendants attempt to rebut this presumption by arguing that 1-800 Ideas.com, Inc. uses its numbers by putting them into service and waiting for persons interested in using those mnemonic numbers to call the number at which time 1-800 Ideas.com, Inc. works with the interested party to develop a marketing and, and possibly, a shared use plan for the number for a fee.

The FCC regulations require that a toll-free subscriber possess a contemporaneous intent to use a toll-free number "for the provision of toll free service" at the time the number is acquired. See 47 C.F.R. § 52.107(a) ("[H]oarding is the acquisition by a toll free subscriber from a Responsible Organization of more toll free numbers than the toll free subscriber intends to use for the provision of toll free service . . . .") That 1-800 Ideas.com, Inc. has activated and used some of the numbers to which is subscribes does not, alone, "preclude a finding that the subscriber has engaged in . . . hoarding." Patients Plus, Inc., 12 F.C.C.R. at 13275-77. The billing records generated

42

by one of 1-800 Ideas.com, Inc.'s carriers, Global Crossing, indicate that Global

Crossing is the carrier for 6,428 toll-free numbers.  (Doc. No. 146 Ex. 10.)  The billing

records show that at least eighty of these numbers had no usage during 1-800

Ideas.com, Inc.'s subscribership when Global Crossing was its carrier.  (Id.)  While this

evidence is sufficient to force Original Defendants to rebut the presumption that they

hoarded numbers, ultimately, Plaintiff must show that Original Defendants did not intend

to use the Disputed Numbers for the provision of toll-free service during the time

claimed.

Richard Jones, the responsible employee at 1-800 Ideas.com, Inc., has stated

that "[f]rom March 15, 2001 until approximately March 2002 the disputed toll free

numbers were being utilized by [1-800 Ideas.com, Inc.] in the course of its normal

business practices."  (Doc. No. 146 Ex. 24 ¶ 7.)  As noted in discussing Plaintiff's

warehousing claim, the context and meaning of Parker's use of the term "potential

subscriber" in relation to 1-800 Ideas.com, Inc.'s subscribership of the Disputed

Numbers is in dispute.  The Court finds that this dispute, among others, goes to the

issue of Original Defendants' intentions when subscribing to the Disputed Numbers.

During the time charged by Plaintiff, whether 1-800 Ideas.com, Inc. intended to put the

Disputed Numbers into use for the provision of toll-free service or merely was waiting for

"actual subscribers," given its marketing and shared use services, is contested.  The

Court finds that under the circumstances presented, there are genuine issues of

material fact in dispute as to Plaintiff's hoarding claim, even as limited to the time period

from March 15, 2001 until approximately March 2002.  Based upon the above findings,

the Court recommends denying summary judgment to Plaintiff on his claim of hoarding.

### 3.   Brokering

Plaintiff alleges that Original Defendants violated 47 C.F.R. § 52.107(a)(2) and

(a)(3) which provide:

> (2) No person or entity shall acquire a toll free number for the purpose of selling the toll free number to another entity or to a person for a fee.
>
> (3) Routing multiple toll free numbers to a single toll free subscriber will create a rebuttable presumption that the toll free subscriber is . . . brokering toll free numbers.

The question for the Court is whether Original Defendants acquired either of the

Disputed Numbers for the purpose of selling those numbers.  Plaintiff cites to a

complaint the Red Cross lodged with the FCC against 1-800 Ideas.com, Inc. in which

the Red Cross complained: "1-800 Ideas.com, [Inc.] has implied to the Red Cross in

telephone conversations that [1-800 Ideas.com, Inc.] would be willing to relinquish the

number [1-800-RED-CROSS] to the American Red Cross in return for compensation in

excess of $1,000,000."  (Id. Ex. 26 at 2.)  The Court finds that the Red Cross's charge is

merely that—the FCC has not tested the veracity of the charge, and 1-800 Ideas.com,

Inc. has, in correspondence with the FCC, flatly disputed the assertion that it offered to

sell the number to the Red Cross for any amount of money.  (See Doc. No. 168 Ex. R,

Email from David Sprouse to Kris Monteith ("I would like to reiterate that at no time did

800 Ideas.com represent to the American Red Cross that it would sell the number for

any amount of money.")

Plaintiff also argues that "Defendants claimed in the past to possess" at least ten

(non-disputed) numbers which they no longer possess.  (Doc. No. 145 at 17-18.)

Plaintiff argues that from such evidence, "it can with certainty be inferred that [Original]

Defendants would not part with" those ten numbers without charging a fee given

Original Defendants' "documented behavior of retaining toll-free numbers which never

even elicit the call of a single potential actual subscriber."  (Id. at 17-18.)  The Court

finds that the evidence does not warrant this certain inference.  It is not clear when or by

which Defendant these numbers were acquired or disposed of or how that disposal

occurred.

Plaintiff further argues that 800-Ideas, Inc.'s correspondence with Choice

Mortgage USA concerning the disputed 800 number, dated November 12, 1997

demonstrates that "Defendants" admit to brokering.  (Doc. No. 145 at 17.)  In that letter,

1-800 Ideas.com, Inc. states:

> Please mail the original paperwork back in the enclosed UPS Overnight to
> 800 IDEAS, with the onetime activation charge of $1000.00.  Please make
> the check payable to 800 Ideas Inc.
>
> If during the course of normal activation of the Choice One Mortgage account
> with Avid-AT&T-Wizcom, CMS or 800 Ideas Inc., Choice One Mortgage
> decides that it does not want to enter into contract for Voice Services and
> obtain the rights to [the 800 disputed number], then 800 Ideas Inc. will refund
> the onetime activation charge, provided that 800 Ideas Inc. will refund the
> onetime activation charge, provided that 800 Ideas Inc. has not released and
> still retains the rights to [the disputed 800 number].[8]

(Doc. No. 146 Ex. 18.)  While it is not clear from the record exactly what the $1,000

---

[8] The letter is on "800 Ideas Inc." stationery but Steven Parker, Chairman of the Board of 1-800 Ideas.com, Inc. has stated, "Beginning in November 1997, the 800 Disputed Number was in use by 800 Ideas.com on behalf of its customer, Choice Mortgage USA."  (Doc. No. 168 at Ex. B ¶ 45.)  Given this representation, the Court deems the letter to be the product of 1-800 Ideas.com, Inc.

45

activation charge bought Choice Mortgage USA, it does appear that it was part of an agreement between 1-800 Ideas.com, Inc. and Choice Mortgage USA whereby the former entity would transfer to the latter entity the "rights" to the disputed 800 number. The record, however, does not show that 1-800 Ideas.com, Inc. ceased to be the subscriber of record for the disputed 800 number as a result of its agreement with Choice Mortgage USA in light of Original Defendants' representations that:

> [T]he undisputed facts . . . demonstrate that defendant 800-Ideas.com, Inc. has at all times remained the subscriber and has continuously used and controlled the Disputed Numbers.
>
> . . . .
>
> [1-]800 Ideas.com, Inc. has, from time to time assigned the call traffic on the two Disputed Numbers to others, (i.e. Choice USA Mortgage and 1-800 San Diego, Inc.), but at all times [1-]800 Ideas.com, Inc. has remained the subscriber to and retained control of the two Disputed Numbers.
>
> . . . .
>
> [T]he Disputed Numbers have never left 800 Ideas.com, Inc.'s control and [1-]800 Ideas.com, Inc. has been the sole subscriber to the Disputed Numbers throughout the relevant time period for this case; there has been no point in time where a change of subscriber took place . . . .

(Doc. No. 167 at 3, 9, 34.)  Taken in a light most favorable to Defendant, the Court finds that the record contains material fact disputes concerning whether or not 1-800 Ideas.com, Inc. brokered the disputed 800 number in its dealings with Choice USA Mortgage.

Finally, Plaintiff represents that on August 9, 2000, 1-800 Ideas.com, Inc.'s Jones attempted to broker the Disputed Numbers:

> In contact with [Jones], I was told I could purchase an Internet address for $100,000 and be given the [disputed 800 number] for free or I could purchase an Internet address for $80,000 and be given the [disputed 888

number] for free.  The disparity in pricing for an Internet address based on which toll-free number is given with it is clear evidence of brokering of a toll free number.

(Doc. No. 146 Ex. 21.)  In a May 31, 2002 affidavit, Jones conceded that he spoke with someone on August 9, 2000 who "claimed to be working for an advertising agency and looking to use a 'Choice' number to match a jingle being developed for an unnamed client."  (Doc. No. 56 Ex. 11 ¶¶ 8-9.)  Jones denied offering Hammann either of the Disputed Numbers "in conjunction with an Internet domain for a certain sum of money."  (Id. ¶ 11.)

Based upon the above, the Court finds that there exist genuine issues of material fact in dispute that preclude granting Plaintiff's motion for summary judgment on his brokering claim.  Under the standard applicable in considering Plaintiff's summary judgment motion, Original Defendants have successfully rebutted Plaintiff's claims.

### 4.    Violation of Lag Time Regulations

Plaintiff also alleges that Original Defendants violated 47 C.F.R. § 52.103 which provides:

(a) Definitions. As used in this section, the following definitions apply:

(1) Assigned Status. A toll free number record that has specific subscriber routing information entered by the Responsible Organization in the Service Management System database and is pending activation in the Service Control Points.

(2) Disconnect Status. The toll free number has been discontinued and an exchange carrier intercept recording is being provided.

(3) Lag Time. The interval between a toll free number's reservation in the Service Management System database and its conversion to working status, as well as the period of time between disconnection or cancellation of a toll free number and the point at which that toll free

number may be reassigned to another toll free subscriber.

(4) Reserved Status. The toll free number has been reserved from the Service Management System database by a Responsible Organization for a toll free subscriber.

(5) Seasonal Numbers. Toll free numbers held by toll free subscribers who do not have a year-round need for a toll free number.

(6) Spare Status. The toll free number is available for assignment by a Responsible Organization.

(7) Suspend Status. The toll free service has been temporarily disconnected and is scheduled to be reactivated.

(8) Unavailable Status. The toll free number is not available for assignment due to an unusual condition.

(9) Working Status. The toll free number is loaded in the Service Control Points and is being utilized to complete toll free service calls.

(b) Reserved Status. Toll free numbers may remain in reserved status for up to 45 days. There shall be no extension of the reservation period after expiration of the initial 45-day interval.

(c) Assigned Status. Toll free numbers may remain in assigned status until changed to working status or for a maximum of 6 months, whichever occurs first. Toll free numbers that, because of special circumstances, require that they be designated for a particular subscriber far in advance of their actual usage shall not be placed in assigned status, but instead shall be placed in unavailable status.

(d) Disconnect Status. Toll free numbers may remain in disconnect status for up to 4 months. No requests for extension of the 4-month disconnect interval shall be granted. All toll free numbers in disconnect status must go directly into the spare category upon expiration of the 4-month disconnect interval. Responsible Organizations shall not retrieve a toll free number from disconnect status and return that number directly to working status at the expiration of the 4-month disconnect interval.

(e) Suspend Status. Toll free numbers may remain in suspend status until changed to working status or for a maximum of 8 months, whichever occurs first. Only numbers involved in billing disputes shall be eligible for suspend status.

(f) Unavailable Status.

(1) Written requests to make a specific toll free number unavailable must be submitted to DSMI by the Responsible Organization managing the records of the toll free number. The request shall include the appropriate documentation of the reason for the request. DSMI is the only entity that can assign this status to or remove this

status from a number. Responsible Organizations that have a toll free subscriber with special circumstances requiring that a toll free number be designated for that particular subscriber far in advance of its actual usage may request that DSMI place such a number in unavailable status.

(2) Seasonal numbers shall be placed in unavailable status. The Responsible Organization for a toll free subscriber who does not have a year round need for a toll free number shall follow the procedures outlined in § 52.103(f)(1) of these rules if it wants DSMI to place a particular toll free number in unavailable status.

Plaintiff contends that Original Defendants: (1) acquired the disputed 800 number in 1993; (2) transferred the disputed 800 number to Choice Mortgage USA in 1997; and (3) transferred the disputed 800 number from Choice Mortgage USA back to Original Defendants in 2000 or 2001.  (Doc. No. 145 at 4-5, 22-24.)  Plaintiff argues that Original Defendants violated the FCC's lag time regulations by not placing the number in disconnect status in connection with the above transfers.  (Id. at 24.)  Original Defendants respond that "[s]ince appproximately 1993, the 800 Disputed Number has at all times been effectively in use and under subscription control by 800 Idea.com, Inc., or its predecessor in interest."  (Doc. No. 167 at 9.)  Original Defendants argue that "from time to time" 1-800 Ideas.com, Inc. has "assigned the call traffic on the two Disputed Numbers to others, (i.e., Choice USA Mortgage and 1-800 Dan Diego, Inc.) but at all times 800 Ideas.com, Inc. has remained the subscriber to and retained control of the two Disputed Numbers."  (Id.)  The Court finds there are genuine issues of material fact in dispute as to whether the Disputed Numbers were ever discontinued as that term is used in connection with the FCC lag-time regulations such that Original Defendants had a legal obligation to place the disputed numbers in disconnect status.  Therefore, the

Court recommends denying Plaintiff's motion for summary judgment on his lag time claim.

### 5.   Violation of First Come First Served Regulations

Plaintiff alleges that Original Defendants violated 47 C.F.R. § 52.111 which provides: "Toll free numbers shall be made available on a first-come, first-served basis unless otherwise directed by the [FCC]."  In his motion for summary judgment, Plaintiff alleges that Original "Defendants violated the first come first served regulations . . . when they transferred both of the [Disputed Numbers] to 1-800 San Diego, Inc. in mid-July 2002."  (Doc. No. 145 at 26.)  For § 52.111 to apply, however, Plaintiff would have had to have made a formal request for the Disputed Numbers.  See Patients Plus, Inc., 12 F.C.C.R. at 13275-77.  Plaintiff alleges that he requested the Disputed Numbers and that Original Defendants knew of this request.  (Fifth Amend. Compl. ¶¶ 56, 145-154.)  Plaintiff has filed an affidavit in which he states that on August 9, 2000, Richard Jones of 1-800 Ideas.com, Inc. offered to sell him the Disputed Numbers.  (Doc. No. 149 Ex. 1.)  Prior to 1-800 Ideas.com, Inc.'s transfer of the Disputed Numbers to 1-800 San Diego, Inc., Plaintiff asserts that Defendant 1-800 Ideas.com, Inc. had been served with a state court complaint  "which requested as relief that . . . Plaintiff be assigned the two" Disputed Numbers.  (Doc. No. 145 at 26.)

Original Defendants, however, argue that Plaintiff never made a formal request for the numbers.  (Doc. No. 167 at 31.)  They cite Plaintiff's deposition testimony in which Plaintiff was asked about his conversations with Richard Jones of 1-800 Ideas.com, Inc. on August 9, 2000:

| | |
|---|---|
| Q: | After having turned down what you report here as the offers to sell you two different toll-free numbers and domain names, is there anything else about that call you remember? |
| Plaintiff: | Nothing else about that call that I remember. |
| Q: | Did you say anything about what you were going to do in response to those high prices? |
| Plaintiff: | I certainly may have.  And Mr. Jones alleges that I did. Whether I did or not, I don't—I don't recall with any degrees of confidence as to what I may or may not have said.  I certainly may have said what Mr. Jones alleges I said. |
| Q: | What is that please? |
| Plaintiff: | He alleges that I said, you know, "I'll go start looking for a different number." |
| Q: | Okay. |
| Plaintiff: | And, in fact, that is what I did.  So if I actually indicated to him that that's what I was going to do, that would be a reasonable thing for him to have alleged, because that's what I did, and he wouldn't know what I actually did after I hung up with him. |

(Doc. No. 168 Ex. S at 211-12.)  Original Defendants contend that, in the above deposition testimony, Plaintiff "admitted he told 800 Ideas.com, Inc. that he would search for alternative numbers."  (Doc. No. 167 at 3.)  Original Defendants also state, without legal citation, that the relief Plaintiff requested in his state complaint "does not in and of itself constitute legitimate notice of toll-free number reservations sufficient to trigger the first-in-time FCC rules."  (Doc. No. 31.)

First, while the Court does not deem Plaintiff's deposition testimony to be an admission of any sort, it does demonstrate that there exists a dispute about a material fact—whether Plaintiff ever presented Original Defendants with a formal request for the Disputed Numbers.  Second, the Court has read Plaintiff's December 7, 2001 state complaint.  In the last sentence of the state court complaint, Plaintiff, "prays the Court

grant the Plaintiff subscriber of record status to these two toll free numbers" [i.e., the Disputed Numbers].  (Doc. No. 146 Ex. 28.)  In the context of this case, the Court finds that the state court complaint relief request, alone, is not sufficient to constitute formal notice of Plaintiff's request for the Disputed Numbers to warrant summary judgment on his first come first served claim.  Therefore, the Court recommends denying Plaintiff's motion for summary judgment motion on his first come first served claim.

Based upon the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED that:**

1.    Original Defendants' Motion to Dismiss (Doc. No. 122) be **GRANTED in part and DENIED in part** as follows: The Court recommends that all of Plaintiff's claims against Steven Parker, Richard Jones, and David Sprouse be dismissed and the remainder of the relief requested be denied;

2.    Defendant 800 - Ideas, Inc.'s Motion to Dismiss (Doc. No. 153) be **GRANTED** without prejudice;

3.    Plaintiff's Motion for Summary Judgment on his claims against 800 Ideas, Inc. (Doc. No. 172) be **DENIED as moot**;

4.    Plaintiff's Motion for Summary Judgment on his claims against Original Defendants (Doc. No. 143) be **DENIED**.

Dated: July 14, 2006

s/ Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge

Under D. Minn. L.R. 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by July 31, 2006, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Any party wishing to oppose such objections must file and serve all parties with its response.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.